### THE GRACE AND RUBY (two cases).

(District Court, D. Massachusetts. September 18, 1922.)

Nos. 2182, 2183.

1. Customs duties ⚙➡130—Forfeiture of vessel for smuggling liquors.

A foreign vessel, lying outside the three-mile limit, which delivered a part of her cargo of liquors, which were contraband, in the nighttime, to a motorboat, in which it was taken ashore with the assistance of her small boat and part of her crew, *held* subject to forfeiture under Rev. St. § 2874 (Comp. St. § 5565).

2. Customs duties ⚙➡121—Act may constitute different offenses.

Unlading a vessel in the nighttime, in violation of Rev. St. § 2872, 2874 (Comp. St. §§ 5563, 5565), is no less an offense under said sections because, being without a permit, it is also an offense under section 2867 (section 5555).

3. Admiralty ⚙➡23—Has jurisdiction of offending foreign vessel seized outside three-mile limit.

The fact that a foreign vessel, which had violated the laws of the United States, was seized outside the three-mile limit, *held* not to deprive a court of the United States of jurisdiction of the offense under a libel filed after she had been brought into port.

4. International law ⚙➡5—Foreign vessels in contact with shore subject to seizure.

Foreign vessels, hovering always more than three miles from shore for the purpose of smuggling, which have been in contact with the shore by their own boats and crews, and have thereby assisted in smuggling, are subject to seizure.

Libel by the United States against the schooner Grace and Ruby. On exceptions to libel for lack of jurisdiction. Overruled.

Charles P. Curtis, Asst. U. S. Atty., of Boston, Mass.
Daniel A. Shea, of Boston, Mass., for claimant Sweeney.

MORTON, District Judge. These are libels for the forfeiture of the schooner Grace and Ruby for smuggling liquor in violation of Rev. St. §§ 2872, 2874 (Comp. St. §§ 5563, 5565), and the National Prohibition Act (41 Stat. 305). They were heard upon exceptions to the libels, raising solely the question of jurisdiction. The facts are settled by stipulation of the parties. Those essential to a decision may be briefly stated as follows:

The Grace and Ruby was a British vessel owned and registered in Yarmouth, Nova Scotia, and commanded by one Ross, a British subject. She sailed from the Bahama Islands, British West Indies, with a St.

John, N. B., clearance, on February 10, 1922, having a cargo of liquor, part of which was owned by one Sullivan, of Salem, Mass., who was on board. From the Bahamas she proceeded directly to a point about six miles off Gloucester, Mass., where Sullivan was set on shore and the schooner stood off and on, keeping always more than three miles from land. Two days later Sullivan came out to her in motorboat Wilkin II, owned in Gloucester and manned by two men, to bring provisions to the schooner and to take on shore part of her cargo. At that time the schooner was about ten miles from the nearest land. About 8,000 bottles of whisky and some other liquors were there transferred from the Grace and Ruby into the motorboat and taken to shore at night. Three members of the crew of the schooner, as well as Sullivan, went in the Wilkin II, and a dory belonging to the schooner was towed along, presumably for use in landing the liquor, or to enable the men to return to the schooner after the liquor was landed. The attempt to land the liquor was discovered by revenue officers, and Wilkin II and her cargo were seized.

The next day the revenue cutter Tampa was ordered to find the Grace and Ruby and bring her into port. Two days later, on February 23d, she discovered the schooner, and after some show of resistance on her part, which was overcome by a display of force by the cutter, the schooner was seized and brought into the port of Boston by the Tampa. At the time of the seizure the Grace and Ruby was about four miles from the nearest land. She had on board the balance of her cargo of liquor. Her master is no way assented to the seizure. After the schooner was brought into Boston the present libels were filed, a warrant for her arrest issued, and she was taken into custody by the United States marshal.

[1] From the agreed facts it is clearly inferable that the master of the Grace and Ruby knew that she was engaged in an enterprise forbidden by the laws of the United States; that he knew her cargo was contraband; that she was lying off the coast beyond the three-mile limit, but within the four-league limit, for the purpose of having her cargo taken ashore in other boats; and that before her seizure part of her cargo had been transferred to Wilkin II for the purpose, as her master knew, of being smuggled into this country, with the assistance of the schooner's crew and boat. There is nothing to suggest any intent on his part, if that be material, that the Grace and Ruby herself should go within the territorial jurisdiction of this country, and so far as appears she never did. She was hovering on the coast for the purpose of landing contraband goods, and had actually sent, at night, a part of her cargo ashore, with her boat and three of her men to assist in landing it.

[2] While the question is not free from doubt, and no decision upon the point has come to my notice, it seems to me that this action on her part constituted an unlawful unlading by the Grace and Ruby at night within the territorial limits of the United States, in violation of Rev. St. §§ 2872, 2874. See 1 Wheaton, Criminal Law (11th Ed.) §§ 324, 330, 341, for a discussion of the principles involved and a collection of cases. The act of unlading, although beginning beyond the three-mile limit, continued until the liquor was landed, and the schooner was ac-

tively assisting in it by means of her small boat and three of her crew, who were on the motorboat for that purpose. It was none the less an unlawful unlading, within the section referred to, because by the transfer to the motorboat an offense was committed under section 2867, which rendered the motorboat and liquor liable to seizure and forfeiture, and the persons who aided and assisted liable to a penalty for so doing. The two classes of offenses are substantially different. I am aware that there has been a difference of judicial opinion about the scope of these sections. See U. S. v. The Hunter (1806) Fed. Cas. No. 15428; The Industry, Fed. Cas. No. 7028 (1812); The Betsy, Fed. Cas. No. 1365; The Harmony, Fed. Cas. No. 6081; The Active, Fed. Cas. No. 33. I follow the opinion of Mr. Justice Story, both because it is the law of this circuit and because it seems to me to be the sounder view.

[3] The case, then, is that the Grace and Ruby, having violated our law and laid herself liable to forfeiture under it if she could be reached, was forcibly taken four miles off the coast by an executive department of the government and brought within our jurisdiction. The present question is whether on such facts this court has jurisdiction of a libel brought by the government for the forfeiture of the vessel. It is to be noticed that the schooner is held in these proceedings on the arrest made by the marshal under the warrant that was issued on the filing of the libels, and not under the seizure made by the cutter, when the schooner was taken and brought into Boston. Whether she could have been seized beyond the three-mile limit for an offense committed wholly beyond that limit is not the present question.

The high seas are the territory of no nation; no nation can extend its laws over them; they are free to the vessels of all countries. But this has been thought not to mean that a nation is powerless against vessels offending against its laws which remain just outside the three-mile limit. It has been said:

"It can provide by statute or other municipal regulation for the seizure and forfeiture of such vessels, though belonging to foreign nations, within the waters adjacent to its coasts, if reasonably necessary for its proper protection and the enforcement of its laws. It is on this ground that the four-league limit established by Rev. St. § 2867 (Comp. St. § 5555), in regard to unlading rests. * * *

"Its [a nation's] power to secure itself from injury may certainly be exercised beyond the limits of its territory. * * * These means do not appear to be limited within any certain marked boundaries which remain the same at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to." Marshall, C. J., Church v. Hobbart, 2 Cranch, 187, 234–236.

See, too, Manchester v. Massachusetts, 139 U. S. 240, 258, 11 Sup. Ct. 559, 35 L. Ed. 159.

These expressions have been questioned by writers on international law, and are perhaps not entirely consistent with views which have been expressed by our State Department.[1] But Church v. Hubbart has

---

[1] See Dana's note 108 on what is now Rev. St. § 2867, in Wheaton, International Law, § 179, in which, after discussing Church v. Hubbart and

never been overruled, and I am bound by it until the law is clearly settled otherwise. Moreover, the principle there stated seems to me such a sensible and practical rule for dealing with cases like the present that it ought to be followed until it is authoritatively repudiated. This is not to assert a right generally of search and seizure on the high seas, but only a limited power, exercised in the waters adjacent to our coasts, over vessels which have broken our laws.

The mere fact, therefore, that the Grace and Ruby was beyond the three-mile limit, does not of itself make the seizure unlawful and establish a lack of jurisdiction.

[4] As to the seizure:

The line between territorial waters and the high seas is not like the boundary between us and a foreign power. There must be, it seems to me, a certain width of debatable waters adjacent to our coasts. How far our authority shall be extended into them for the seizure of foreign vessels which have broken our laws is a matter for the political departments of the government rather than for the courts to determine.

It is a question between governments; reciprocal rights and other matters may be involved. In re Cooper, 143 U. S. 472, 503, 12 Sup. Ct. 453, 36 L. Ed. 232; The Kodiak (D. C.) 53 Fed. 126, 130. In the case of The Cagliari, Dr. Twiss advised the Sardinian government that:

"In ordinary cases, where a merchant ship has been seized on the high seas, the sovereign whose flag has been violated waives his privilege, considering the offending ship to have acted with mala fides towards the other state with which he is in amity, and to have consequently forfeited any just claim to his protection."

He considered the revenue regulations of many states authorizing visit and seizure beyond their waters to be enforceable at the peril of such states, and to rest on the express or tacit permission of the states

other cases, he concludes " * * * that the principle is settled that municipal seizures cannot be made for any purpose beyond territorial waters. It is also settled that the limit of these waters is, in the absence of treaty, the marine league or the cannon shot." What Mr. Dana says is quoted with approval in Moore's International Law Digest, the latest work of authority on the subject. 1 Moore's Digest International Laws, 726–730, § 151. Mr. Dana's position seems to accord with that taken by our State Department. In a letter by Mr. Fish, Secretary of State, to Sir Edward Thornton, British Minister, January 22, 1875, Mr. Fish says: "We have always understood and asserted that pursuant to public law, no nation can rightfully claim jurisdiction at sea beyond a marine league from its coast." See 1 Moore's Digest of International Law, 731, § 151. See, also, letter by Mr. Buchanan, Secretary of State, to Mr. Crompton, British Minister, August 19, 1884. Id. p. 730. And Mr. Evarts, Secretary of State, in a letter dated August 11, 1890, to Mr. Fairchild, Minister to Spain, speaking of the provisions of our revenue laws in regard to visitation within four leagues of the coast, says: "This is not dominion over the sea where these vessels are visited, but dominion over this commerce with us, its vehicles and cargoes, even while at sea. It carries no assertion of dominion, territorial and in invitum, but over voluntary trade in progress and by its own election."

None of these communications, however, related to vessels committing unfriendly or hostile acts against the country on whose coasts they were hovering. In The Carlo Alberto (Wheaton, International Law [5th Eng. Ed.] p. 171), the French Court of Cassation condemned a neutral vessel which had landed enemies on French soil and afterwards put into a French port in distress.

whose vessels may be seized.  1 Moore's Internat. Law Digest, pp. 729, 730.

It seems to me that this was such a case.  The Grace and Ruby had committed an offense against our law, if my view as to the unlading is right, and was lying just outside the three-mile limit for purposes relating to her unlawful act.  In directing that she be seized there and brought into the country to answer for her offense, I am not prepared to say that the Treasury Department exceeded its power.

An order may be entered, overruling the exceptions to each libel alleging lack of jurisdiction.