**THE MARJORIE E. BACHMAN (two cases).**

**UNITED STATES v. 600 CASES, MORE OR LESS, OF ASSORTED LIQUOR.**

(District Court, D. Massachusetts. February 27, 1925.)

Nos. 2837, 2844, 2845.

1. **Intoxicating liquors ⬥⇒246—Seizure of British vessel held unauthorized by treaty.**

Seizure of a British vessel laden with liquors, anchored 21½ miles from shore, *held* unauthorized by the Treaty of May 22, 1924, where the only evidence to support the seizure was that she sold liquor to a government boat, which was capable of a speed of 35 to 40 miles an hour, and which was sent for the purpose of entrapment; her speed being falsely represented as not exceeding 15 miles.

2. **International law ⬥⇒5—Seizure of foreign vessel not authorized, unless actually or constructively within territorial jurisdiction.**

There is no right under international law to condemn and forfeit a foreign vessel, unless she brings herself, actually or constructively, within the territorial limits of the United States, and it is not sufficient to bring her constructively within those limits that, while on the high seas, she trades with independent small boats, which put out to her from shore.

3. **International law ⬥⇒5—Doctrine of constructive presence of foreign vessel should be applied with caution.**

The doctrine of constructive presence of a foreign vessel within the territorial limits of the United States should be applied with caution, as in extending the rights of this country we are invading those of other nations.

Libels by the United States against the schooner Marjorie E. Bachman and against 600 cases, more or less, of assorted liquors, comprising her cargo, for forfeiture of the schooner, for penalties against her, and for forfeiture of her cargo. Libels dismissed.

Harold P. Williams, U. S. Atty., and Laurence Curtis, 2d Asst. U. S. Atty., both of Boston, Mass.

William H. Lewis and Matthew L. McGrath, both of Boston, Mass., for defendant.

MORTON, District Judge. These are three libels brought by the United States: (1) For the forfeiture of the schooner Marjorie E. Bachman; (2) for the forfeiture of her cargo of liquor; and (3) for penalties against her. The case was heard in open court. Most of the essential facts are not seriously in dispute.

The Bachman is a Canadian schooner, having a Canadian registry and crew. She was chartered to one Green on a time charter to carry liquor to the high seas adjoining the coast of this country, with the expectation that it would there be discharged into small boats, not connected with the schooner, and smuggled ashore. The charter provides that the movements of the schooner should be under the general direction of Green. The Bachman secured a cargo of liquor from a vessel at sea, and at St. Pierre or Miquelon. She then proceeded to this coast, and anchored near the Stellwagen Bank, 21.2 miles from the nearest land. Communications passed between the

schooner and Green, who was in Gloucester or Boston; and liquor was delivered over her side to small boats, which he sent or caused to be sent to her. This had been going on for 10 days or 2 weeks before the seizure.

The seizure was made by the revenue cutter Tampa at 7:40 a. m. on October 24, 1924, at the location above stated, under the following circumstances: The United States Coast Guard brought around from New London, Conn., a very fast sea sled capable of making 35 to 40 miles an hour. A disguised crew was placed on this boat, and it was sent to the Bachman to make a purchase of liquor. When the sea sled came alongside the Bachman and asked to purchase liquor, an inquiry was made as to her speed. The government agent in charge replied that the speed was only 15 miles, which he knew was false. The Bachman thereupon sold and delivered overside to the sea sled 25 cases of liquor. Under the conditions then existing, the sea sled was capable of making the distance to land within an hour. After receiving the liquor, she did not proceed to land, but went to the cutter Tampa, which was on the high seas nearer Boston. Most of the liquor was thrown overboard as soon as the Bachman was out of sight. The rest remained on the sea sled until she went into Boston two or three days later. This is the only purchase relied upon by the United States as making the vessel subject to forfeiture; it was conceived and carried out from start to finish by officers of the United States. There is nothing to suggest that the Bachman had ever before dealt with boats capable of making the distance to shore within an hour, or that those in charge of her had any intention of dealing with such boats. The officers on the sea sled had no intention of taking the liquor which they bought ashore in her; they meant to go, as they did go, to the Tampa, which was not within territorial limits of the United States. Nor did the officers intend to introduce the liquor into this country in any unlawful way. The men on the Bachman by whom the sale was made supposed that the liquor was to be smuggled into this country by a boat not able to make the distance to land within one hour.

After the seizure, a prize crew was put upon the schooner; her own crew were taken off and sent on board the Tampa; she was left at anchor where she lay for two or three days in charge of the prize crew; and she was then towed into Boston by the cutter Tampa. The evidence satisfies me that during this interval there was gross misconduct on the part of the prize crew. Many articles belonging to the Bachman's crew, which had been left on board, were stolen; a number of cases of wines and liquors were opened and drunk or thrown away; a large amount of the Bachman's food supply was used up. There is testimony from several witnesses, persons who were arrested when they came to the Bachman for liquor, that most or all of the prize crew were drunk. These stories are no doubt exaggerated, but the details with which some of them are told leave no doubt that there is a considerable substratum of truth in them. It was the duty of the officers, having seized the vessel, to send her with her crew on board promptly to the nearest port. Instead, this vessel, with her master and crew removed and her open hold full of liquor, was held at anchor for two days, during which she was freely visited by the officers and men of the Coast Guard Service.

After the Bachman had been brought into the port of Boston, her crew were again placed on board her and were kept prisoners there. The following day counsel for them and for the vessel endeavored to see them, but was not permitted to do so. The master and crew were taken to the customhouse and put through an examination by an assistant United States attorney, in the absence of their counsel and in the presence of half a dozen officials, several of them officers of the Coast Guard force. They were then, still in custody, taken to the United States commissioner's office, and there arraigned on criminal charges against them. A transcript of the statements of the master, Ritcey, on this examination, was offered in evidence on the hearing of this case, and I excluded it as having been coercively and improperly obtained.

Two questions are presented: (1) Whether the schooner was rightfully seized; and (2) whether she has committed any offense against the laws of the United States warranting her condemnation and forfeiture.

[1] As to (1): There is no statute of the United States authorizing seizure of foreign vessels more than 12 miles from our coasts. The government's right to seize the Bachman is rested, as it must be, solely upon the provisions of the treaty between this country and Great Britain, proclaimed May 22, 1924 (43 Stat. ——). The claimants dispute that the treaty gave any such right. The provisions of it pertinent to this case are found in article 2. This article provides, in substance: (1) That Great Britain will

raise no objection to visitation and search of her private vessels by our officers on the high seas; (2) "if there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions, prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws;" and (3) "the rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States, its territories or possessions, by a vessel other than the one boarded and searched, it shall be the speed of such other vessel, and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."

I have previously had occasion to consider the rights of hovering vessels and the effect of this treaty in The Grace and Ruby (D. C.) 283 F. 475, and The Frances Louise (D. C.) 1 F.(2d) 1004. In construing and applying such an instrument, of course, the object is to ascertain the intention of the contracting parties. The circumstances surrounding its execution were referred to in The Frances Louise, ubi supra, and need not be restated. The enlarged rights of seizure over British vessels which it granted to this country were predicated on real, commercial transactions. I do not believe either party to it contemplated that official vessels of the United States, of a special type much speedier than are used in commercial transportation, would be used by us to entrap British vessels in order to forfeit them for our benefit. Our officers might be expected to try out suspected vessels by endeavoring to purchase liquor from them. But it is doubtful whether such purchases can ever furnish a ground of seizure under the treaty, because, as the transactions would not be illegal at the place where made, and the officers making them would have no intention to introduce the liquor purchased into this country in violation of our laws, the foreign vessel would not in fact be participating in any illegal act in making such sales. However this may be, it is clear, I think, that, where the alleged right of seizure is based upon such a transaction, the boat used by our officers must be similar in speed to those commercially used for such purposes or to those with which the foreign vessel has theretofore been dealing, neither of which is true in this case. To use a decoy a special and unusual type of boat having a capacity for speed far greater than ever used in real transactions, and to obtain a purchase by lying on the part of our officers about her speed, is mere entrapment, quite outside the purpose and intent of the treaty.

"A seizure of a person not a subject, or of a vessel not belonging to a subject, made on the high seas for the breach of a municipal regulation, is an act which the sovereign cannot authorize. The person who makes this seizure, then, makes it on a pretext which, if true, will not justify the act, and is a marine trespasser. To a majority of the court it seems to follow that such a seizure is totally invalid; that the possession acquired by this unlawful act is his own possession, not that of the sovereign; and that such possession confers no jurisdiction on the court of the country to which the captor belongs." Marshall, C. J., Rose v. Himely, 4 Cranch, 241, 279 (2 L. Ed. 608).

It should be plainly said that pretentions of right to seize foreign vessels beyond our territorial limits which have been made and in some cases acted upon by our Coast Guard and revenue officers far exceed anything which can fairly be claimed under international law as it now exists. The many and weighty authorities on this point referred to in 1 Moore's Digest of International Law, p. 725 et seq. leave no room for doubt as to the present state of the law. International law applies on all the seas and coasts of the world, and its settled principles ought not to be subverted by the exigencies, perhaps temporary, of a single nation on a particular coast. The seizure seems to me to have been wholly illegal, and on all the evidence I so find and rule.

This is sufficient to dispose of the case. It is unnecessary to decide whether the Bachman committed any offense against our laws which rendered her subject to condemnation and forfeiture. I may add, however, that her offense is, to say the least, doubtful. We have no statute which undertakes to extend our municipal law farther than 12 miles from the coast. Latham v. U. S., 2 F.(2d) 208, is cited in support of the government's contention. There can be no doubt of the correctness of the decision in that case; the

instructions of the District Judge under which the conviction was returned can hardly be questioned. But the view of the Circuit Court of Appeals that the 'statute of the United States, which makes all persons aiding and abetting in a misdemeanor guilty as principals, reaches beyond the territorial limits of this country, and makes guilty under our law persons who in foreign jurisdiction aid and abet in the commission of misdemeanors here, is a wide departure from what I have supposed the law to be. Mr. Fish, Secretary of State of the United States, wrote to the British Minister under date of January 22, 1875: "We have always understood and asserted that pursuant to public law no nation can rightfully claim jurisdiction at sea beyond a marine league from its coast." See Moore's Dig. Internat. Law, p. 731. And this seems to be the general understanding of the matter. Moreover, that statute makes no reference to vessels and does not undertake to make them forfeitable for offenses against our law committed by those on board them.

[2] There is no right to condemn and forfeit the Bachman unless she brought herself actually or constructively within the territorial limits of the United States. So far as appears, she was never actually within our territory. It is not sufficient, to bring a foreign vessel constructively within it, that, while on the high seas, she trades with independent small boats which put out to her from our shore. This is plainly the assumption on which both nations proceeded in making the treaty. Nor is the fact that her general movements were controlled by a person on shore here, who communicated with her from time to time, sufficient to place her constructively within our jurisdiction. If, in addition to these two facts, it had appeared that she was provisioned from shore, I should incline to the opinion that she was in such close contact with the shore as to be subject to our municipal law. In this case, however, there is no evidence that the Bachman was provisioned from shore at any time before the seizure.

[3] The doctrine of constructive presence, being a mere fiction of the law, should be applied with caution. In extending the rights of this country we are invading those of other nations. The question is really one of international law. Moreover, as to British vessels, this country has expressly agreed not to seize them, except within the provisions of the treaty. As to them, if there is no case under the treaty, there is no case at

all when they are on the high seas. If a finding on this point be required for purposes of appeal, then on all the evidence I find and rule that the Bachman did not commit any offense against the laws of this country, which rendered her subject to condemnation and forfeiture.

I may add that there is no evidence that the crew of the Bachman offered any resistance to the seizure, or that there was any danger in permitting them to remain on their own vessel, and that, this being so, there was no right to arrest them, or to remove them from her. The treatment which they received and the behavior of the prize crew on the Bachman were indefensible.

What has been said with reference to the libel for the forfeiture of the schooner applied to the libels against the cargo and against her for 'penalties.'

Decree may be entered, dismissing all these libels.