### THE PANAMA.

(District Court, S. D. Texas, at Galveston. May 23, 1925.)

No. 1233.

1. International law ⬤�top5—Right to search British vessel for violation of law held not limited by treaty.

The right of the United States to seize and search vessels for violation of law is not limited to any particular distance from shore, seizure outside the territorial limits being subject only to diplomatic considerations, and such right as to British vessels is not affected by the treaty.

2. Intoxicating liquors ⬤�top246—British vessel held subject to forfeiture for unlawful landing of liquor.

A British vessel, shown to have previously landed intoxicating liquors in violation of law, *held* subject to seizure on the high seas and to forfeiture therefor.

Libel of Forfeiture. Suit by the United States against the British gas screw schooner Panama and its cargo of intoxicating liquor. Decree of forfeiture.

Edwin R. Warnken, Asst. U. S. Atty., of Houston, Tex.

McDonald & Wayman, of Galveston, Tex., for respondent.

HUTCHESON, District Judge. This is a libel brought by the United States to forfeit the schooner Panama and her cargo of intoxicating liquor; the schooner having been seized while anchored 12.1 miles from the nearest point of shore off Galveston, and having a cargo of intoxicating liquor only. Upon reasonable ground for suspicion that she was violating the liquor laws of the United States, the Coast Guard cutter Co-

manche caused her to be boarded and searched—the commander of the Comanche at that time believing that she was within the terms of the treaty; that is, that under her equipment she could reach shore within one hour's time.

No evidence exists of any violation of the law off Galveston which would entitle the government to forfeiture. It was abundantly proven, however, that the Panama was then and had been for many months regularly engaged in bringing cargoes of intoxicating liquor from Havana and other points to New Orleans; that this was done under prearrangement with persons on shore, and that off Breton Island on other trips, and on this particular trip on or about May 19, 1924, just five days before her seizure, she had by prearrangement been met by shore boats, and had through them delivered about 400 cases of liquor into the port of New Orleans, and had proceeded thence, in accordance with her master's and supercargo's instructions, to the point off Galveston where she was expecting contact with shore boats.

There was an affidavit of Alvarez claiming the cargo, and one of W. T. Aldham claiming ownership of the vessel. No evidence was offered by the claimants in support of these affidavits, while the evidence tends to show, and I find, that both the vessel and her cargo were really owned and controlled by New Orleans rum smugglers, who had been directing the movements of the ship and disposing of the cargo for her. The evidence is overwhelming that the Panama, at the time of her seizure, was without the 12-mile limit, and also was a greater distance from shore than she could cover in one hour.

On these facts the government contends, upon the authority of U. S. v. Bengochea (C. C. A. 5th) 279 F. 537; The Grace and Ruby (D. C.) 283 F. 475; The Henry L. Marshall (D. C.) 286 F. 260; The Henry L. Marshall (C. C. A.) 292 F. 486; The Henry L. Marshall, 263 U. S. 712, 44 S. Ct. 38, 68 L. Ed. 519, 520; Latham et al. v. U. S. (C. C. A.) 2 F.(2d) 210; U. S. v. 2,180 Cases of Champagne (Schooner Zeehond) 4 F.(2d) 735, Eastern District of New York, decided March 4, 1925; The Island Home, unreported decision of this court—that, though the Panama had not come within either the territorial waters or the search limits mentioned in the examination limits fixed in the 12-mile statute (Comp. St. Ann. Supp. 1923, § 5841h), or

described in the treaty (43 Stat. 141), she had made actual contact and had effected an unlading in violation of the statutes off the coast of New Orleans, and that, this being the first port into which she had been brought after seizure, she was subject to forfeiture here.

The defendant, relying upon The Frances Louise (D. C.) 1 F.(2d) 1004, The Over the Top (D. C.) 5 F.(2d) 838, Thomas, J., and The Bockman, Morton, J., unreported, asserts, first, that the seizure was unlawful and could confer no right, because outside of the statutory limit, and also the limits fixed by the treaty, and further that, even if the seizure was justified, there was no evidence of violation by the schooner and the owner of the cargo off New Orleans, which would justify forfeiture.

[1] I have, in The Island Home and The Rosalie M., both decided without reference to the treaty, declared my view that the right of the executive to seize and search for violations of our laws is not limited by any particular distance from the shore. Nor do I think the treaty changes this right. It merely expresses a diplomatic agreement in advance to the doing of those things which the United States already had authority to do, subject only to political accountability to foreign nations whose bottoms were searched, and I therefore overrule the contention of the defendant that the terms of the treaty have made search and seizure unlawful.

Since I have found that the Panama was outside of the treaty limits when seized, it is not necessary for me to dispose of the government's invocation of the decision of Judge Campbell, in United States v. The Pictonian, that the criminal laws of this country have by the treaty been extended in their application to the limits of the treaty, except to say that I thoroughly agree with Judge Thomas, in The Over the Top, that this has not occurred, and that, while Congress may pass laws extending the point of unlading beyond 12 miles, and to the limits fixed in the treaty, until Congress has enacted some municipal law governing the matter, nothing in the treaty changes or affects our laws; the treaty expressly providing merely that His Brittanic Majesty will make no objection to the seizure of British ships within the treaty limits, and a disposition of these seizures in accordance with the laws of the United States.

[2] This brings me then to the question of whether the evidence shows a violation in New Orleans of the applicable statutes, so as to subject the Panama and her cargo to forfeiture, and, believing as I do that the evidence not only indicates, but overwhelmingly establishes, this fact, I have no hesitation in finding for the government for forfeiture against both the ship and her cargo