## THE SAGATIND.

## THE DIAMANTINA.

(Circuit Court of Appeals, Second Circuit.
April 5, 1926.)

### Nos. 322–325.

1. **Customs duties ⬤➡130—Intoxicating liquors ⬤➡246—Rum-smuggling treaties with Great Britain and Norway are not self-executing, in sense that they extend territorial jurisdiction of laws of United States, and vessels and liquor cargo seized held not subject to forfeiture (43 Stat. pt. 2, pp. 1761, 1772; National Prohibition Act [Comp. St. Ann. Supp. 1923, § 10138¼ et seq.]; Tariff Act 1922, §§ 584, 585, 586, 592 [Comp. St. Ann. Supp. 1923, §§ 5841h3, 5841h4, 5841h5, 5841h11]; Rev. St. § 3450 [Comp. St. § 6352]).**

Treaties with Great Britain and Norway (43 Stat. pt. 2, pp. 1761, 1772), affecting smuggling of liquor, are not self-executing, in the sense that they extend the territorial jurisdiction of laws of United States to a point measured by the speed of a boat, and Congress not having attempted to specifically so extend such laws, vessels and liquor cargo seized more than 20 miles from shore, which had not been within a collection district and were not shown to have made any sales of liquor to persons intending to introduce it into commerce of the United States, were not subject to forfeiture under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), or Tariff Act 1922, §§ 584, 585, 586, 592 (Comp. St. Ann. Supp. 1923, §§ 5841h3, 5841h4, 5841h5, 5841h11), or Rev. St. § 3450 (Comp. St. § 6352).

2. **Customs duties ⬤➡130—Intoxicating liquors ⬤➡246.**

Treaties with Great Britain and Norway (43 Stat. pt. 2, pp. 1761, 1772), affecting smuggling of liquor, exclusively determine status of liquor-laden vessels of appropriate nationality lying off coast of United States.

Appeals from the District Court of the United States for the Southern District of New York.

Four libels by the United States against the Norwegian steamship Sagatind, her engines, etc., Karl Johnsen, claimant, against certain liquor comprising her cargo, C. P. Chartier, claimant, against the British steamship Diamantina, her engines, etc., the Glen Fishing Company, claimant, and against certain liquor comprising her cargo, the Glen Fishing Company, claimant. From decrees dismissing libels (8 F.[2d] 788), the United States appeals. Affirmed.

See, also, 4 F.(2d) 928.

These four causes, which were tried together, seek the condemnation and forfeiture of the Norwegian steamship Sagatind and the British steamship Diamantina and the cargoes of liquor found on board both vessels. The causes of forfeiture alleged in the libels are as follows:

11 F.(2d)—43

As to the Sagatind: That this vessel, on or about October 6, 1924, "arrived within the limits of the collection district of New York from some foreign port"; that somewhat later, "after arriving within four leagues of the coast of the United States," she "made contact" with the shore by means of a "small boat called the Thorndyke," and thus caused or permitted to be sent ashore considerable quantities of liquor; that between May 1 and September 18, 1924, much whisky was "removed, deposited, and concealed on board," with intent to defraud the United States of the tax on the same; and that this offense was repeated between September 18 and October 11, 1924. The statutes invoked and relied upon are the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), sections 585 and 586 of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, §§ 5841h4, 5841h5), and R. S. § 3450 (Comp. St. § 6352).

As to the cargo ex Sagatind: The allegations are that that vessel, at and before the time of her seizure, remained off the coast of "New Jersey and/or Long Island" with the design of introducing "into the United States [her] cargo of intoxicating liquor unlawfully and without payment of duties thereon," and that the same cargo was between September 18 and October 12, 1924, "at the port or collection district of New York, : deposited and concealed aboard and by means of" said Sagatind. The statutes relied upon are the National Prohibition Act, section 592 of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, § 5841h11), and R. S. § 3450.

As against the Diamantina: That that vessel on or about October 12, 1924, "arrived within the limits of the collection district of New York from some foreign port," and by means of a certain small boat, acting in concert with her, "made contact with the shore of the United States and" unladed "within the limits of the collection district of New York 25 cases of intoxicating liquor"; that such unlading was by deposit of the liquor in a small boat, which boat was capable of sailing to shore within one hour from the point at which the liquor was received ex Diamantina. The statutes relied upon are the National Prohibition Act, sections 585, 586, Tariff Act of 1922, and R. S. § 3450.

As to the cargo of the Diamantina: The allegations are that, while she was off the coast "of New Jersey or New York" for the purpose of introducing intoxicating liquor into the United States, the owners of said intoxicating liquor did unlade from said vessel and did land in said United States a quantity

of said liquor by means of "certain small boats and motor vessels"; also that she had on board when seized the liquor proceeded against in this suit, which was not "then and there included and described in any manifest"; also that said steamer so seized had "deposited and concealed aboard said cargo of intoxicating liquor" with intent to defraud the United States of taxes. The statutes relied upon are the National Prohibition Act, sections 584, 592, of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, §§ 5841h3, 5841h11), and R. S. § 3450.

The story giving rise to these libels is as follows:

The Sagatind under time charter received in Belgium a cargo of liquor. She cleared for St. Pierre, but her instructions were to repair to a point more than four leagues from the coast of the United States, and there discharge her cargo into such vessels as might be directed, but never into an American vessel. The orders for discharge were to be given, and were given, by a supercargo who was not a member of the crew. The steamer anchored more than 20 miles from any point on the American coast, and she did discharge portions of her cargo while on the high seas into certain British vessels, one of which was the Thorndyke.

The Sagatind had made another voyage, and had apparently done much the same thing, earlier in the year 1924. This is what is meant by the reference in the pleadings to the allegedly unlawful transaction of the Sagatind during the period beginning May 1, 1924.

On the voyage which resulted in this seizure, she arrived off the New Jersey coast about October 6, 1924, and on the evening of October 11th the Diamantina was lying alongside her, more than 20 miles at sea, and liquor was being transhipped from Sagatind to Diamantina. All the liquor found on the latter vessel at the time of seizure had come from the Sagatind. The Diamantina came from Halifax in ballast for the obvious purpose of getting the liquor; the evidence leaves little doubt that the Diamantina intended to peddle the liquor along the coast of the United States.

On the evening of October 11th a vessel of the Coast Guard, "Sea Sled No. 2239," came alongside the Diamantina, and a "special agent of the Internal Revenue Service" from her went on board and purchased the 25 cases of liquor mentioned in the pleadings; all of this liquor, except a small quantity kept for purposes of evidence, was thrown overboard, and on the following day the Coast Guard vessel on the station repaired to the anchorage of the British and Norwegian vessels, seized them and their cargoes, and brought them into New York. They were then lying by observation 22.7 knots from the coast.

Neither Sagatind nor Diamantina is under most favorable circumstances capable of making more than 10 knots an hour; there is no evidence whatever as to the speed of the Thorndyke, nor is it shown what became of her, or any of the other British vessels that had received liquor from the Sagatind before the evening of October 11th. The Coast Guard "Sea Sled" is said to have made under favorable conditions 33 miles an hour, but as to what her speed was in the open sea with a cargo of 25 cases of liquor aboard there is no evidence worth mentioning.

On these facts the libels were all dismissed, whereupon the United States appealed.

Emory R. Buckner, U. S. Atty., and Herman T. Stichman, Asst. U. S. Atty., both of New York City, for the United States.

Wise, Whitney & Parker and Henry A. Wise, all of New York City, for the cargo of the Sagatind.

Kobbé, Thatcher, Frederick & Hoar, of New York City (Karl T. Frederick and John Schubert, both of New York City, of counsel), for the Sagatind.

Louis Halle, of New York City, for the Diamantina and cargo.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The material facts are very few, and we think it clear that they were well known to the governmental authorities before libels filed; a closer attention to them would have prevented a nightmare of pleading, but that pleading occurred before the appointment of the present United States attorney.

Of the allegations of fact above enumerated, some are false. Thus it is untrue that either vessel ever voluntarily came within four leagues of this coast; there is no pretense of evidence that Sagatind "made contact" with the shore by means of Thorndyke, and none that the owners of Diamantina's cargo landed in the United States any liquor whatever.

Other allegations are immaterial, viz. everything relating to the earlier voyage of Sagatind.

It is not necessary to dilate on the stat-

utes referred to in the libels; they all prohibit or punish, or both, acts done within the jurisdiction of the United States and the courts thereof, and they have recently received consideration by us in The Henry L. Marshall (C. C. A.) 292 F. 486 (certiorari denied 44 S. Ct. 38, 263 U. S. 712, 68 L. Ed. 519, 520), Romano v. United States (C. C. A.) 9 F.(2d) 522, and United States v. 2180 Cases of Champagne (C. C. A.) 9 F.(2d) 710.

These decisions hold that a vessel lying 22 miles off our coast is on the high seas; that a sale or gift of liquor there made by an alien is unaffected by the laws of this country, which have no territorial application so far from land; but that a foreign ship beyond our territorial waters may so arrange communication with the land, as to land liquor or other commodities in the United States, and introduce the same into our commerce, just as a man may deposit in or introduce goods into a house, by means of a hook on a long pole, though no part of the physical man ever enters said house.

But all these cases are based on facts arising before the effective date of the treaties regarding "Smuggling of intoxicating liquors," made with Great Britain May 22, 1924, and Norway July 2, 1924 (43 Stat. pt. 2, pp. 1761 and 1772). The only arguable point in this circuit and on this record is whether the treaties have authorized the proceedings here avowed, which are otherwise indefensible.

The governmental position or theory is perhaps best shown by those parts of each libel which allege that acts were done justifying forfeiture "within the collection district of New York" or in the United States, when the pleader knew that no res seized, whether vessel or liquor, was ever within 22 miles of our shores until dragged in by the Coast Guard.

Consequently the position is and must be that quoad Britain and Norway these treaties have extended the territorial application of all and every law of the United States, useful for preventing liquor smuggling, to a point measured by the speed of any boat that can induce a vessel of either the contracting nations to sell a drink.

This is claiming a good deal; yet government on this record must go that far, for Sagatind sold nothing, and, though Diamantina did sell to "Sea Sled," the men thereon indignantly repudiated the idea that they procured the liquor for the purpose of introduction into the commerce of the United States. But if at the time and place the laws of this country applied, and both vessels were within the collection district of New York, plenty of offenses can be found, and some of them are pleaded.

[2] We agree with The Frances Louise (D. C.) 1 F.(2d) 1004, that these treaties exclusively determine the status of vessels of appropriate nationality lying off the shore of the United States; but nowhere in the treaties can any words be found indicating an intent on the part of the contracting parties to change or extend the limits of the territory of the United States. In fact, the contrary is plainly indicated by article 1 of each treaty.

Whatever rights government derived from the treaties must be discovered in article 2 of each document. Of this article, section 1 relates wholly to search, and section 3 to the distance from shore at which all rights may and must be exercised. There remains section 2, which declares:

"If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States * * * prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port * * * for adjudication in accordance with such laws."

Thus the question is: Were Sagatind and Diamantina within the United States, or the jurisdiction of its laws, on October 11, 1924?

We are not called on to consider the international effect of our hovering statutes, or the power of Congress to prescribe what is commonly called the 12-mile limit. Nor are we required to pass on congressional authority specifically to extend our customs, internal revenue, and prohibition laws to a distance at sea measured by the speed of a hypothetical boat, for nothing of the kind has been attempted. But we do hold that no such extension of territorial jurisdiction is created by the treaty; in that sense the treaty is not self-executing, and on this point we cannot agree with The Pictonian (D. C.) 3 F.(2d) 145, nor with United States v. Henning (D. C.) 7 F.(2d) 488; but we do agree with The Over The Top (D. C.) 5 F.(2d) 838, and The Panama (D. C.) 6 F.(2d) 326, and the court below. The probable cause clause in the final decrees was inadvertently approved when decrees signed, as is admitted.

Let the decrees severally be modified, so that the clause in question shall read as follows: "It is further ordered that there was probable cause for the seizure of the [res] by the persons who made the seizure."

As modified, decrees affirmed.