## THE CHERIE.

## DUCOS et al. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. July 2, 1926.)

### No. 1989.

1. **Customs duties ☞130—Foreign vessel, anchored and disposing of liquor cargo within four leagues of the coast, held subject to penalty and forfeiture for unlawful unlading (Tariff Act 1922, § 586 [Comp. St. Ann. Supp. 1923, § 5841h5]); "arrival;" "unlade."**

A vessel from a foreign port, laden with liquors anchored within four leagues of the coast, and the master without a permit therefor, allowed part of the cargo to be taken away, with the intention of so disposing of the entire cargo. *Held*, that the vessel had "arrived" and was "unlading," within the meaning of Tariff Act 1922, § 586 (Comp. St. Ann. Supp. 1923, § 5841h5), and was subject to the penalty and forfeiture thereby imposed for unlawful unlading.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Unladen; First and Second Series, Arrive—Arrival.]

2. **Customs duties ☞130—All of cargo of vessel seized while unlawfully unlading is subject to forfeiture (Tariff Act 1922, § 586 [Comp. St. Ann. Supp. 1923, § 5841h5]).**

Under the provision of Tariff Act 1922, § 586 (Comp. St. Ann. Supp. 1923, § 5841h5), that the master of a vessel unlawfully unlading merchandise shall be subject to a penalty, and "such vessel and the merchandise shall be subject to seizure and forfeiture," the merchandise forfeitable is the entire cargo and not the part only that was unlawfully unladen.

Bingham, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Maine; John A. Peters, Judge.

Proceedings by the United States against the schooner Cherie and her cargo, consisting of 3,300 cases, more or less, of intoxicating liquors. Decrees for forfeiture and penalty. From the decree of forfeiture, Henry Ducos and others, claimants, appeal. Affirmed.

For opinion below, see 9 F.(2d) 640.

Louis Halle, of New York City (John B. Merrill, of Bangor, Me., Max Pinansky, of Portland, Me., and C. Frank Hathaway, of Lynn, Mass., on the brief), for appellants.

Frederick R. Dyer, U. S. Dist. Atty., of Portland, Me. (William B. Nulty, Asst. U. S. Dist. Atty., of Portland, Me., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The court below entered decrees forfeiting the schooner Cherie and her cargo of liquors. The claimant appealed, and assigned thirty-one errors, cut down in argument to four points, only one of which calls for serious consideration. The facts, stated substantially as found by the court below, are as follows:

[1] The two-masted schooner Cherie, 95 tons burden, of French registry, and flying that flag, having cleared from Halifax to Nassau with a large cargo of liquors, arrived off the coast of Maine on June 19, 1925, and anchored seven or eight miles southwesterly of Swan's Island. The weather had been pleasant, the vessel had encountered no stress, and had met with no accident.

The conclusions of the court below—that she came thus to this position for the purpose of disposing of her cargo, and that this was an arrival under the statute—are fully warranted by the evidence. Harrison v. Vose, 9 How. 372, 381, 384, 13 L. Ed. 179. Thereupon various residents of Swan's Island and its vicinity went out to the vessel and bought liquors, some by the bottle and some by the case. This traffic went on from June 19 to the morning of June 21, when prohibition and customs officers, informed of the situation, went out to the vessel and boarded her. The captain, on being told that the officers had information that the vessel was in touch with the shore and was selling liquor, and that they proposed to seize her, asserted his right to be where he was and to do what he was doing. The vessel and cargo were then seized and taken to port.

13 F.(2d)—63

The court below also found, on adequate evidence, that the same vessel had been in about the same position a month before, carrying on the same kind of business, and had also been carrying on the same kind of traffic off Boston. In brief, the Cherie was an offshore rum runner.

It is therefore clear that this is a case where a master of a vessel from a foreign port, anchored within four leagues of our coast and caused, or permitted, merchandise to be unladen, having no permit therefor, and not having come to the proper place to discharge, with the intention of unloading the whole cargo there in violation of our customs laws.

The seizure and forfeiture were grounded on section 586 of the Tariff Act of September 21, 1922 (42 Stat. 980 [Comp. St. Ann. Supp. 1923, § 5841h5]), the pertinent part of which is as follows:

"*Unlawful Unloding—Exception.* The master of any vessel from a foreign port or place who allows any merchandise (including sea stores) to be unladen from such vessel at any time after its arrival within four leagues of the coast of the United States and before such vessel has come to the proper place for the discharge of such merchandise, and before he has received a permit to unlade, shall be liable to a penalty equal to twice the value of the merchandise but not less than $1,000, and such vessel and the merchandise shall be subject to seizure and forfeiture."

There follows a proviso to cover unlading due to accident or stress of weather, etc., not claimed to be here applicable.

Turning now to the points argued, the appellant's first three contentions,—

(1) That the Cherie was not within twelve miles of the coast;

(2) That there was no arrival within the meaning of section 586, supra;

(3) That there was no unlading within the meaning of said section

—are without merit, for the evidence fully warranted the findings of the court below. Compare Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249; United States v. Bengochea (C. C. A.) 279 F. 537; Cunard S. S. Co. v. Mellon, 262 U. S. 100, 122 and cases, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

[2] The only contention calling for discussion is as to whether section 586 is to be construed as warranting a forfeiture of the entire cargo or only of the merchandise unladen. This is obviously nothing but a question of statutory construction. This statute is a revision of Revised Statutes, § 2867 (Comp. St. § 5555), which originated in the Act of March

2, 1799, c. 22, § 27 (1 Stat. 648). The pertinent part of the original statute read:

"If after the arrival of any vessel laden with merchandise and bound to the United States, within the limits of any collection district, or within four leagues of the coast, any part of the cargo of such vessel shall be unladen, for any purpose whatever, before such vessel has come to the proper place for the discharge of her cargo, or some part thereof, and has been there duly authorized by the proper officer of the customs to unlade the same, the master of such vessel and the mate, or other person next in command, shall respectively be liable to a penalty of one thousand dollars for each such offense, and the merchandise so unladen shall be forfeited, except in case of some unavoidable accident, necessity, or distress of weather."

The new statute (section 586) it will be observed, cuts out the language, "and bound to the United States within the limits of any collection district," and provides that the master "shall be liable to a penalty equal to twice the value of the merchandise but not less than one thousand dollars," and also provides, "and such vessel and the merchandise shall be subject to seizure and forfeiture."

Manifestly, the new statute was intended to broaden the scope and increase the penalties for such species of smuggling. No question is or can be made that the new statute provides for the forfeiture of the vessel.

We agree with the court below that it also covers the cargo, and for two main reasons:

(1) Congress would not have been likely to provide so drastic a remedy as the forfeiture of a vessel without at the same time providing for the forfeiture of the offending cargo, the unlading from which constituted the real offense against our laws. There are also obvious practical physical difficulties in seizing vessels loaded with nonseizable merchandise, particularly when the typical cargo will be liquors under the ban of our Constitution and its enforcing legislation.

(2) In the old statute it was provided "the merchandise so unladen shall be forfeited." The new statute omits the significant words "so unladen."

We are not warranted in reading back into the statute these significant words that Congress left out.

Whether the penalty imposed upon the offending master is measured by the merchandise unladen, or by the entire cargo, is a point not involved on this record. But, even if merchandise unladen measures the master's penalty, that is not, in our view, enough to overcome the inference that, when Congress omitted the words "so unladen" in the forfeiture clause, it meant that the cargo, as well as the vessel, should be forfeited. While the statute is in general terms—applicable to all merchandise—we should be blind not to see that in motive and dominating purpose it flows from our national prohibition policy, the Eighteenth Amendment. Congress had, as we think, no intention of allowing cargoes of liquors on seized rum runners to escape forfeiture. Compare The Sagatind (C. C. A.) 11 F.(2d) 673, 675; The Over The Top (D. C.) 5 F.(2d) 838; The Panama (D. C.) 6 F.(2d) 326.

The decrees of the District Court are affirmed.

BINGHAM, Circuit Judge (dissenting). According to the record, this appeal is from two decrees of the federal District Court for Maine, entered January 9, 1926, one decreeing the condemnation and forfeiture of the schooner Cherie, her engines, boats, boilers, tackle, apparel, and furniture, and the other condemning and forfeiting the liquors found on board her.

There does not seem to have been any appeal from the decree assessing a penalty of $1,000 against the master, although the libel upon which that decree was based and the decree are printed in the record.

In the opinion of the court below, the judge stated that he was unable to find substantial merit in any of the numerous grounds of forfeiture set forth in the libels except those based on section 586 of the Tariff Act of 1922, and, although section 586 is not mentioned or referred to in the libel for a penalty as a basis or ground for assessing one, the court assessed a penalty of $1,000 against the master. As the decree assessing it is not appealed from, I pass the matter without further consideration other than to say that the government states in its brief that it relies on section 594 of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, § 5841h14), to sustain the decree of the penalty. But section 594 does not undertake to define the ground on which a penalty may be incurred by a master, but simply provides that, if he incurs one, it may be collected out of the ship.

Section 586 of the Tariff Act of 1922 (42 Stat. p. 980) and on which the libels for the forfeiture of the schooner and liquors on board her were based and the decrees appealed from made, reads as follows:

"The master of any vessel from a foreign port or place who allows any merchandise (including sea stores) to be unladen from such vessel at any time after its arrival with-

in four leagues of the coast of the United States and before such vessel has come to the proper place for the discharge of such merchandise, and before he has received a permit to unlade, shall be liable to a penalty equal to twice the value of the merchandise but not less than $1,000 and such vessel and the merchandise shall be subject to seizure and forfeiture: Provided, that whenever any part of the cargo or stores of a vessel has been unladen or transshipped because of accident, stress of weather, or other necessity, the master of such vessel shall, as soon as possible thereafter, notify the collector of the district within which such unlading or transshipment has occurred, or the collector within the district at which such vessel shall first arrive thereafter, and shall furnish proof that such unlading or transshipment was made necessary by accident, stress of weather, or other unavoidable cause, and if the collector is satisfied that the unlading or transshipment was in fact due to accident, stress of weather, or other necessity the penalties above described shall not be incurred."

The facts of which there was evidence, and as found by the court, are as follows:

The two-masted schooner Cherie, 95 tons burden, of French registry, and flying that flag, having cleared from Halifax to Nassau with a large cargo of liquors, arrived off the coast of Maine about June 20, 1925, and anchored at a point on the high seas southwesterly of Swan's Island, an inhabited town of Maine, and within four leagues or twelve miles of the coast. The weather was pleasant, and the vessel had not encountered any stress or met with any accident. Her place of anchorage was near or upon fishing grounds frequented by fishermen living on Swan's Island and in towns on neighboring islands. During the forenoon of that day one or more of the fishermen, while out fishing, saw the Cherie come to anchor, and, having learned that she had liquor on board, on returning to land, of their own motion and unsolicited, gave out the information. In the afternoon various fishermen from Swan's Island and vicinity went out in their boats and purchased and took away liquors, some in case lots and others in less quantities, which they used for their own consumption. On the morning of the 21st the customs officers, having learned of the situation, went out from the shore seized the Cherie, and took her, her cargo, the captain, and crew to Bangor. The Cherie came to the place where she anchored for the purpose of disposing of liquors as she might find opportunity. She had no permit to unlade, and had sought none. Her captain

was on board and participated in the disposition of the liquor and was aware of its being unladen from the vessel into the small boats. There is no direct evidence that the liquor unladen reached the shore, but there is evidence from which such inference may be drawn and that the captain allowed it to be unloaded.

It is contended on behalf of the claimant, the captain, that there had been no "arrival" of the vessel within the meaning of the statute at the time the liquor was discharged into the small boats, on the ground that the word means when the vessel enters a port or harbor to do business or to close an outward or inward voyage. Harrison v. Vose, 9 How. 379–383, 13 L. Ed. 179. But that is not the sense in which the word is used in this statute. The language of the act is "after its arrival within four leagues of the coast of the United States," and, as here used, means after a vessel from a foreign port has come into waters within four leagues of the coast, as this vessel had.

It is also contended on behalf of the claimant that for the Cherie to have discharged a part of her cargo into small boats while on the high seas and after her arrival at a point within four leagues of the coast was not an unlading within the meaning of the statute. But the word "unlade" means to unload or relieve a vessel of her burden, and in the proviso of the act it is used as an equivalent of the word "transship," for it there says "that whenever any part of the cargo or stores of a vessel has been unladen or transshipped," etc., showing that the word "unlade," in the connection there used, contemplates a possible unlading on the high seas within four leagues of the coast, a discharge or transshipment of cargo from one vessel to another before arrival at a port or harbor. And I think there is no question but that the facts in this case disclose an unlading from the vessel within the meaning of the statute.

There were allegations in the libels to the effect that "by means of certain vessels, the names of which are to your libelant unknown, acting in concert with said vessel Cherie, the said vessel Cherie made contact with the shore of the United States of America, and there was then unladed from said vessel Cherie, while in contact with the shores of the United States, within the limits of the collection district of Maine, certain merchandise," etc. There was no finding by the court below that the fishermen went out in their boats to procure liquor because of any prearrangement with the Cherie or her crew, or that there was any concert of action, and there was no evidence from which such a finding could be

made. I do not, however, regard these allegations as in any way essential to a libel under section 586. That section does not contemplate the introduction or an attempted introduction of merchandise into the country as a cause of forfeiture. It makes the unlading of a vessel from a foreign port while within four leagues of the coast the ground of forfeiture, irrespective of whether the merchandise unladen at such point is or is not thereafter brought within the territorial limits of the country. It is a provision in aid of our customs laws, and was enacted to prevent foreign merchandise being unladen within four leagues of our coast and thereby forestall the possibility of its being brought into the country by vessels other than the one on which it was brought from the foreign port.

Had section 586 contemplated an importation or attempted importation of merchandise into the country as a ground for forfeiture, these allegations of the libel undoubtedly would have been material and a failure of proof ground for dismissal. The Grace and Ruby (D. C.) 283 F. 475; The Henry L. Marshall (D. C.) 286 F. 260; Id. 292 F. 486; Id. 263 U. S. 712, 44 S. Ct. 38, 68 L. Ed. 519, 520; United States v. 2180 Cases of Champagne (D. C.) 4 F.(2d) 735; Id. (C. C. A.) 9 F.(2d) 710. But they are not material.

Under the decisions there seems to be no question of the power of Congress to enact such a statute. Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249; United States v. Bengochea (C. C. A.) 279 F. 537, 539, 540 and cases there cited. And the four-league zone there provided for is the one extending out four leagues from the land areas of the country, whether they be its main land or islands. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306, and cases there cited.

I am therefore of the opinion that, as the captain or master of the Cherie, a vessel from a foreign port, allowed some of her merchandise (liquor) to be unladen after she arrived within four leagues of the coast of the United States and before she came to a proper place for the discharge of her merchandise and before she had received a permit to unlade, the vessel became subject to seizure and forfeiture; and that the decree of forfeiture as to the Cherie must be affirmed.

In Muriel E. Winters, 6 F.(2d) 466, Judge Hutchinson of the District Court for the Southern District of Texas had before him the construction and application of section 586 to a like state of facts and reached the same conclusion. He also concluded that only such cargo as was unladen became subject to forfeiture, and that that which was on board at the time of the seizure was not so subject. I am of the same opinion. It will be noted that section 586 subjects the master of a vessel who allows any merchandise to be unladen after the vessel's arrival within four leagues of the coast to a penalty equal to twice the value of the merchandise but not less than $1,000, and subjects the vessel and the merchandise to seizure and forfeiture; and the question is, What do the words "the merchandise" as there used mean in the two instances fixing the penalty and the forfeiture? Does the statute, in the clause fixing the penalty as "equal to twice the value of the merchandise," refer to the merchandise discharged after arrival within four leagues of the coast and subject the offender to a penalty of twice the value of that merchandise or to twice the value of that merchandise and the merchandise remaining on board the vessel? The terms used in the statute and their order of use are: (1) "Any merchandise * * * unladen"; (2) "such merchandise"; (3) "the merchandise"—and the two latter would seem to refer directly to the first. It is evident that the construction to be given to the words "the merchandise" in the penalty clause is the same as should be given to the same words used in the forfeiture clause. And I think it may properly be said that, if Congress had intended to impose upon the master a penalty equal to twice the value of all the merchandise, if he allowed any of it to be unladen, it would have said so in plain and unmistakable terms, and, not having done so, it intended to impose as a penalty twice the value of the unladen merchandise, by the unlading of which he offended the law; and that the merchandise subject to forfeiture under the act is likewise only that which the master allowed to be unladen.

Section 586 is not a rum statute. It is a provision of the customs laws, and applies to cargoes of merchandise of every character and description discharged on the high seas within four leagues of the shore from a vessel from a foreign port, without a permit. While it may apply to rum, it is not confined to it. If the vessel is laden with silks consigned to different owners, and the master allows the silk consigned to one person to be unladen within the four-league zone, can it be that Congress, by section 586, intended that the penalty of the master should be double the value of the vessel's cargo of silk rather than double the value of the consignment that was unladen, and that all the cargo, consisting of various consignments to different persons, should be forfeited? I cannot bring

myself to believe that such was the intention, for, if it was, the law would subject innocent persons to penalties of an undue character for the willful acts of a master of a vessel over whom they had no control and who in no way could be regarded as their agent or servant. It would rather seem that the reasonable construction of the act is to confine the forfeiture to the offending goods—those unladen.