**UNITED STATES of America, Appellee,**
v.
**David Keith HENSEL, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**
v.

**Gerald Wayne CASE, Larry Ronald Duke, Robert Curtis Hubbard, Charles Thad Standley and John Jacob Wells, Defendants, Appellants.**

**UNITED STATES of America, Appellee,**
v.

**Creig Lee DILL, Defendant, Appellant.**

**Nos. 81–1538 to 81–1540.**

United States Court of Appeals, First Circuit.

Argued Oct. 5, 1982.

Decided Jan. 25, 1983.

Rehearing and Rehearing En Banc Denied in No. 81-1538 Feb. 28, 1983.

Rehearing and Rehearing En Banc Denied in Nos. 81–1539 and 81–1540 March 9, 1983.

Certiorari Denied May 31, 1983. See 103 S.Ct. 2431.

See also 509 F.Supp. 1364 and 509 F.Supp. 1376.

Michael Avery, Boston, Mass., with whom John P. Ward, Boston, Mass., was on brief, for appellant David Keith Hensel.

Edward T.M. Garland, Atlanta, Ga., with whom Steven H. Sadow, and Garland, Nuckolls & Catts, P.C., Atlanta, Ga., were on brief, for appellants Larry Ronald Duke and Robert Curtis Hubbard.

David C. Pomeroy, Portland, Me., with whom Wheeler, Pomeroy & Snitger, Portland, Me., was on brief, for appellant Charles Thad Standley.

Bruce H. Morris, Atlanta, Ga., with whom Devine & Morris and Melvin Gutterman, Atlanta, Ga., were on brief, for appellant Gerald Wayne Case.

Mark J. Kadish, Atlanta, Ga., with whom Rosalyn S. Kadish, and Kadish, Davis & Brofman, P.C., Atlanta, Ga., were on brief, for appellant John Jacob Wells.

Joseph Beeler, Miami, Fla., with whom Barbara Green, Miami, Fla., was on brief, for appellant Creig Lee Dill.

Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief, for appellee.

Before TIMBERS,* Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

* Of the Second Circuit, sitting by designation.

BREYER, Circuit Judge.

We here consider appeals from several defendants convicted by jury trial of participating in a conspiracy to import and distribute marijuana. Rather than write separate opinions in these several cases, we here consolidate them and treat all the appellants' claims in one opinion. We first set forth the facts upon which many of the defendants' claims depend. Our description is based primarily upon that of the Maine federal district court found in 509 F.Supp. 1364 and 509 F.Supp. 1376. We then consider the claims that raise the most difficult legal issues—those of defendant Hensel—and we follow that analysis with a consideration of the claims of the other defendants. We affirm all of the convictions.

## I

### The Facts

On the morning of May 31, 1980, after a 24-hour chase on the high seas, a Canadian vessel stopped a 65-foot Honduran shrimp boat 65 miles southeast of Nova Scotia. On board the ship the police agents found defendant Hensel, a crew of eight Colombians, and 18.7 tons of marijuana. Three days later Maine state police and federal Drug Enforcement Administration (DEA) agents raided the secluded cove on the coast of Maine where Hensel was to have delivered his cargo. They arrested several of the defendants and gathered the evidence at issue. We shall separately describe the events at sea and on land.

### A

### At Sea

On May 28, 1980, a local fishing vessel, the J. BRADLEY O'HARA, spotted an unfamiliar ship 90 miles southeast of Rockland, Maine. The ship, the M/V PATRICIA, did not seem to be engaged in fishing. Two days later, the PATRICIA approached the O'HARA and Hensel, captain of the PATRICIA, asked permission to use the O'HARA's radio to contact a "partner." Hensel explained that his ship's radio batteries were dead and that its generator did

not work. The crew of the O'HARA assured Hensel that he could use the radio after they had hauled in their fishing nets. During that time, however, the O'HARA's captain became suspicious and sent the Coast Guard a message that the PATRICIA was disabled. When the PATRICIA again approached the O'HARA, the captain told Hensel he had contacted the Coast Guard, and he refused to let Hensel use his radio. "I told him that we knew what he was up to," the mate of the O'HARA testified, "and we didn't want any part of it." Hensel asked that the call be cancelled, but the Coast Guard had already dispatched aid. Hensel then asked the mate of the O'HARA to place three telephone calls. The O'HARA, however, simply relayed the numbers to the Coast Guard.

The Coast Guard sent at least one plane and the cutter RELIANCE to the scene. The plane piloted by Lt. Luginbuhl arrived at about 11:25 and found the PATRICIA lying dead in the water and flying no flag. Lt. Luginbuhl tried unsuccessfully to communicate with the PATRICIA by radio. After he had made several low passes over the ship, the PATRICIA got underway and began sailing toward the northeast.

Lt. Luginbuhl asked the El Paso Information Center computer to check the status of the PATRICIA and found that a ship named the PATRICIA (later discovered to be a different ship) was suspected of smuggling drugs. The Coast Guard ordered the lieutenant to follow the PATRICIA until the RELIANCE arrived; it also notified Agent Drinan of the DEA in Maine and the Canadian Coast Guard of the situation.

Lt. Luginbuhl continued to track the PATRICIA as it headed toward Nova Scotia in the northeast. After further unsuccessful efforts to communicate with the ship, he dropped a message block ordering the PATRICIA to turn around so that officers of the RELIANCE could board the ship. The PATRICIA, however, maintained its course. By 3:00 p.m., a Canadian Coast Guard plane arrived and at the request of the U.S. Coast Guard relieved Lt. Luginbuhl. This plane, too, tried to communicate with the PATRI-

CIA by message block, and it tried to divert the ship from its course by using smoke floats. Nevertheless, the PATRICIA continued toward Nova Scotia. After about four hours, a U.S. Coast Guard plane resumed tracking the PATRICIA, but it was no more able than its predecessors to communicate with the PATRICIA or to turn it from its course.

By 7:00 p.m. it became clear the PATRICIA would escape into Canadian waters before the RELIANCE could intercept it. The Canadian authorities accordingly began their preparations to intercept the PATRICIA, and they dispatched their ship LOUISBOURG. They told the DEA they would board the PATRICIA if it came within Canadian waters, and Agent Drinan encouraged them to do so.

Meanwhile, the DEA discovered that two of the telephone numbers Hensel had asked the O'HARA to call were listed in the names of Florida men suspected of drug crimes. When Agent Drinan learned that the third number was for a Georgia exchange, he told the Coast Guard that the DEA had been monitoring a suspected drug ring on the Maine coast which used Georgia and Florida vehicles. American agents maintained contact with the Canadians throughout the night.

By 5:11 a.m. the Canadian ship LOUISBOURG was within sight of the PATRICIA, and by 6:00 a.m. the American ship RELIANCE had arrived. Both ships tried to communicate with the PATRICIA, using not only radio but flag hoists, a loud hailer, and flashing lights, but neither ship succeeded. The PATRICIA appeared badly rusted and was riding below its waterline. It displayed no nets or fishing gear and apparently contained substantial electronic equipment. Although it had the name PATRICIA on the bridgewing, it showed no homeport and no identification numbers on the hull. It had, by this time, hoisted a Honduran flag.

The RELIANCE notified the LOUISBOURG that since the PATRICIA was a Honduran ship, the RELIANCE officers could not board it without first obtaining the permission of the State Department and the government of Honduras—a process it expected to take 24 to 48 hours. The Canadians, however, believed that they could board the PATRICIA as soon as it came within 21 miles of the Canadian coast. Soon after 9:00 a.m. they told the RELIANCE that, if the RELIANCE did not act, they would. The RELIANCE in turn agreed to let the Canadians land a helicopter on board it if necessary, assured them that it would protect the LOUISBOURG, and apparently manned its fifty-caliber machine gun.

The Canadians swung the LOUISBOURG around the PATRICIA at high speed in an attempt to stop it with its wake. When that failed, they fired a 12-gauge shotgun across the PATRICIA's bow. The sailors aboard the PATRICIA ducked, and the Canadians then aimed at the wheelhouse where three or four men apparently stood. The Canadians blasted the wheelhouse twice, and the PATRICIA came to a halt.

Three armed Canadian agents boarded the PATRICIA and ordered the crew of eight Colombians and defendant Hensel to the stern of the boat. They loosened the bolts on two closed hatches at the bow of the ship and found over 600 burlap bags containing 18.7 tons of marijuana. They arrested Hensel and the Colombians and, because the Colombians spoke no English, used interpreters from the RELIANCE. One of the officers of the RELIANCE then boarded the PATRICIA to check the documentation of the vessel and to inspect its equipment, as well as to ascertain the identities of those arrested. The Canadians towed the ship to Nova Scotia where they unloaded it and stored the cargo.

After originally telling the Canadians that he was from Connecticut and that his ship was headed for Africa, Hensel admitted that his true address was in Florida, that the ship was indeed headed for the United States, and that he was to have earned $400,000 from the delivery. The Canadian officials eventually decided not to prosecute Hensel and on June 3 expelled him from the country. Hensel was flown to

Boston, where Agent Drinan met him at the airport. Hensel called an attorney, and Agent Drinan then arrested Hensel. Hensel appeared before a magistrate and was charged with conspiracy to import marijuana.

### B

### *On Land*

The investigation into the activities on the Maine coast had begun about a month before the PATRICIA arrived. In late April 1980 agents of the DEA and the Maine state police learned that Lot No. 3 of the Turkey Cove subdivision in Tenant's Harbor, Maine, had been bought in the name of defendant Duke's father for $170,-000 in cash. The lot contained just under three acres of relatively secluded land on the Maine coast. On it stood three wood-frame buildings, a wooden garage, and a deepwater dock that gave the residents access to the Atlantic Ocean. A short driveway connected the buildings to a subdivision dirt road, which in turn led to Glenmere Road, a public highway.

The agents also learned that in late April defendant Dill had bought a 32-foot sport-fishing boat, SUNSHINE, in defendant Hubbard's name, and had paid for it with four checks totalling $30,000. Dill had installed in the boat $8,000 worth of electronic equipment. Although Dill and an accomplice told the sellers of the boat that they planned to take it to Massachusetts, agents later saw it at the Turkey Cove lot. Dill, the agents also discovered, had been convicted in 1974 in Venezuela (and sentenced to four years in prison) for possessing 2½ kilograms of cocaine.

On the basis of this information the DEA and the Maine police set up a surveillance program to monitor activity at the Turkey Cove property. Agent Drinan of the DEA and Sgt. Bailey of the Maine police coordinated the operation. They established posts on adjacent properties as well as across the St. George River, and two or three times a week they conducted aerial surveillance. During the day they used a telescope, a spotting scope, and binoculars to monitor

the property, and at night they used a nonmagnifying nightscope. The agents could see people and vehicles on Lot No. 3, but they were unable to observe activities inside any of the buildings.

During May the agents watched the SUNSHINE sail out to sea many times. The boat generally left in the afternoon and returned late at night, often without navigational lights. The agents also saw several vehicles on the property, including eight out-of-state, large-capacity, cargo vans. Near the end of May they observed people strengthening the dock, and they noticed that some of this work was being done at night by flashlight.

At about 11:30 p.m. on June 2 a state policeman at the observation post across the river saw the SUNSHINE return to Turkey Cove accompanied by a sixty- to seventy-foot boat. Although the agents later learned that the SUNSHINE had run aground and was merely being towed home, they initially suspected that this larger boat might be the narcotics boat for which they had been waiting. Accordingly, Agent Cunniff of the DEA and Cpl. Sinclair of the Maine police went to scout the Turkey Cove property. At about 12:30 a.m. they made their way down the subdivision access road and walked to the beach through the woods on the land adjacent to Lot No. 3. They then followed the beach toward Lot No. 3 until they reached a spot where debris blocked their way. Cpl. Sinclair waded through waist-high water around the debris in order to approach the dock. Agent Cunniff waited some minutes and then joined Cpl. Sinclair. Although several people boarded the larger boat, no one unloaded it, and at about 3:00 a.m. the larger boat left.

Having discovered that the boat was not delivering drugs, Agent Cunniff and Cpl. Sinclair decided to leave Turkey Cove. Rather than return through the deep water, however, they chose to take what they said they thought was the most direct route back to Glenmere Road—a route through Lot No. 3. As they walked along the Lot No. 3 driveway, they passed a tan jeep and recorded its license number.

Through a check of the license number, the agents discovered later that night that the jeep was owned by defendant Wells. Agent Drinan then obtained Wells' telephone number and found that the third phone number Hensel had given to the O'HARA had been Wells' number—with two digits transposed. At this point, the connection between the PATRICIA and the Turkey Cove property became clear. Moreover, at about 4:30 the next afternoon the agents monitoring Turkey Cove learned that Hensel had been deported from Canada and arrested at Boston's Logan airport. More critically, however, they learned that Hensel had telephoned an attorney in Boston and told him to call a woman who "would know who to call and know what to do." Worried that Hensel's acquaintance would have relayed the news of the PATRICIA to those at Turkey Cove, the agents decided to survey the property more closely and, if appropriate, to make arrests.

At about 7:15 p.m., Agent Cunniff saw the tan jeep turn off the access road at Turkey Cove onto Glenmere Road. He followed the jeep and signalled it to stop. Defendant Case climbed out of the jeep and asked if something was wrong. Agent Cunniff identified himself as a narcotics agent and, when he saw defendant Hubbard crouched in his seat in the jeep, opened the door and asked Hubbard to step out. As Agent Cunniff did so he found a CB radio with a 12-volt battery and an antenna. Two state policemen had arrived by this time, and the agents put the defendants under arrest.

Agent Cunniff and Cpl. Bailey feared, however, that Hubbard might have used the CB radio in the jeep to alert the men at Turkey Cove. To prevent those present from escaping or destroying evidence, the police decided to raid Lot No. 3. They arrested defendant Standley by the boathouse and found defendant Duke sitting at a desk in the main house. Duke was writing on sheets of paper, later entered into evidence as Government Exhibit 111, and a yellow pad, Government Exhibit 110, lay nearby. The agents found $2,000 in cash on Duke's desk and $44,000 in an open brief-

case. Agent Cunniff arrested Duke; defendants Dill and Wells apparently were arrested later.

The seven appellants, together with two other defendants, were indicted by a grand jury on June 12, 1980, and charged with conspiracy to possess with intent to distribute and to import into the United States approximately 18.7 tons of marijuana, in violation of 21 U.S.C. §§ 846 & 963. Eight of the defendants were tried together before a jury with Chief Judge Gignoux, of the U.S. District Court for the District of Maine, presiding. On May 15, 1981, the jury found the seven appellants guilty as charged and acquitted an eighth defendant, William Storey. We previously considered a government appeal from a suppression order concerning the ninth defendant, John Downing, in *United States v. Downing,* 665 F.2d 404 (1st Cir.1981). The lower court's decision on several of the evidentiary issues involved in the appeal at bar can be found at *United States v. Hensel,* 509 F.Supp. 1364 (D.Me.1981) and *United States v. Hensel,* 509 F. Supp. 1376 (D.Me.1981).

## II

### *Hensel's Suppression Claim*

■ We first consider defendant Hensel's suppression claim. He argues that the federal government obtained evidence from the PATRICIA in violation of his Fourth Amendment rights and that the "exclusionary rule" therefore required the district court to suppress all evidence obtained through that seizure. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). We recognize that the "exclusionary rule" applies to searches by American agents on the high seas. *See United States v. Green,* 671 F.2d 46, 53 (1st Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Hilton,* 619 F.2d 127, 131 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *United States v. Miller,* 589 F.2d 1117, 1125–26 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *see also* Note, *High on*

*the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea,* 93 Harv.L.Rev. 725, 726 & n. 9 (1980) [hereinafter cited as Harv. Note]. We are also willing to assume the search violated Canadian law. Even so, however, we believe that the "exclusionary rule" does not authorize suppression here.

We shall analyze Hensel's argument by examining three separate questions. First, is the "exclusionary rule" inapplicable because of the fact that the Canadians, not the Americans, searched the ship? Second, if the exclusionary rule is applicable despite the actions of the Canadians, did the search violate Hensel's constitutionally protected right of privacy? Third, if not, is suppression nonetheless required because the search was unauthorized by statute or Coast Guard regulations?

■ 1. We first consider whether the "exclusionary rule" does not apply to this search because it was conducted by Canadians. As the government points out, the "exclusionary rule" does not require the suppression of evidence seized by foreign police agents, for the actions of an American court are unlikely to influence the conduct of foreign police. *See United States v. Rose,* 570 F.2d 1358, 1361–62 (9th Cir.1978); *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir.1976), *cert. denied sub nom. Martin v. United States,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). This principle does not dispose of the case, however, for there are two well-established exceptions to this rule: (1) where foreign police conduct "shock[s] the judicial conscience," *id.* at 139 and (2) where American agents "participated in the foreign search, or . . . [the foreign officers acted] as agents for their American counterparts. . . ." *Id.* The district court held that the second exception applies here.

The issue is one of applying a legal label to a complex set of facts, some of which suggest significant American involvement while others suggest the contrary. On the one hand, as the district court noted, the Americans began the search, the Americans asked the Canadians to join in the effort, an

American DEA agent urged the Canadians to seize the ship if it entered Canadian waters, the RELIANCE (an American ship) showed firepower and provided back-up assistance during the Canadians' boarding, the RELIANCE provided interpreters after the boarding, and an American officer participated in a second search of the PATRI-CIA. These factors suggest an American-Canadian "joint venture."

On the other hand, the Canadians controlled the search of the PATRICIA, they were searching for evidence of violations of Canadian law, they intended to prosecute Hensel for Canadian crimes, the initial boarding party consisted only of Canadians, the Canadians retained control of all the evidence for some time after its seizure, and American agents may have told the Canadians to make their boarding decision independently. As the district court noted, the question is a "close" one. We see no obvious error, and we shall assume that U.S. participation was sufficient to validate Hensel's foreign search argument. We need not decide this factually based issue definitively, however, for a determination against the government does not change the ultimate result.

■ 2. Next, we must consider whether the search violated any privacy right of Hensel that the Fourth Amendment protects. We believe not. Of course, the search was warrantless—a fact that might ordinarily make it "unreasonable" if it had violated a citizen's reasonable expectations of privacy. *See, e.g., Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *United States v. Miller,* 589 F.2d at 1124; Harv. Note, *supra,* at 727–28. But there are exceptions to the warrant requirement. When this case was tried in 1981, this circuit recognized an exception for searches on the high seas based on "probable cause." *See United States v. Hilton,* 619 F.2d at 131. Later, in 1982, we held that "reasonable suspicion" was sufficient to allow a high seas Coast Guard search. *See United States v. Green,* 671 F.2d at 53. The district court, following *Hilton*'s stricter standard, held that the

Coast Guard had probable cause to believe that those aboard the PATRICIA were conspiring to smuggle contraband into the United States and that they carried contraband aboard the ship. The court wrote:

[T]he record in the present case more than adequately supports the conclusion that the Coast Guard had probable cause to believe that those aboard the PATRICIA were engaged in a conspiracy to smuggle contraband into the United States and that there was contraband aboard the vessel.

For several days the crew of the O'HARA boat had seen the PATRICIA lying idly with no apparent purpose in the Gulf of Maine just outside United States waters, with one white man and several black men on board. An EPIC check disclosed that two of the land line telephone numbers which the white man requested the O'HARA captain to call were listed to suspected drug smugglers and suggested a possible connection between the PATRICIA and a suspected drug offloading site in Maine. An EPIC check further revealed that a vessel named PATRICIA was suspected of drug smuggling. The PATRICIA had no fishing gear or nets on deck, yet sat low in the water. The only identification was the name PATRICIA on the bridgewing. The vessel did not fly the flag of any country until approached by the LOUIS-BOURG and the RELIANCE, at which time it raised an Honduran flag. The PATRICIA carried sophisticated electronic and radar equipment. When the first Coast Guard plane arrived, the vessel got underway and fled, although the white man had reported to the O'HARA boat that she was disabled and in need of assistance. During the ensuing pursuit, the PATRICIA continuously refused to identify herself, to stop, or to deviate from her northeasterly course, despite repeated attempts by the Coast Guard to communicate with the vessel by radio, message block, smoke floats, flag hoists and loud hailer. During the entire night the PATRICIA was under observation, the vessel was operating without naviga-

tional lights, steering an erratic course toward the open sea. Only after the RCMP aboard the LOUISBOURG opened gunfire did the PATRICIA finally come to a stop. These facts add up to ample probable cause for the Coast Guard to believe that the PATRICIA was engaged in a conspiracy to smuggle contraband into the United States.

*United States v. Hensel,* 509 F.Supp. 1364, 1374 (D.Me.1981). The district court's finding of probable cause is fully supported by the evidence.

3. Finally, we consider Hensel's claim that the evidence must be excluded because, whether or not there was "probable cause," the search exceeded the Coast Guard's statutory authority (and violated its regulations). He claims that the only statute that could have authorized the search is 14 U.S.C. § 89(a), which states:

The Coast Guard may make ... searches, seizures and arrests upon the high seas ... for the prevention, detection and suppression of violations of laws of the United States. For such purposes [Coast Guard] ... officers may ... go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States ... and search the vessel ....

Hensel believes that this statute does not authorize searches that violate international law and that the search of a foreign vessel without the flag state's permission is such a violation of international law. Therefore, Hensel argues that the search at bar was not authorized by statute, that it is therefore an "unreasonable search" within the terms of the Fourth Amendment, and that consequently its fruits should be suppressed.

This claim is best analyzed in terms of three separate questions: (a) Does the relevant statute authorize searches that violate international law? (b) If not, did this search violate international law? (c) If so, does the "exclusionary rule" require suppression of the evidence?

(a) We agree that § 89(a) does not authorize searches that violate international law. The rule is well established, at least since the time of Chief Justice John Marshall, that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804); *see, e.g., Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21, 83 S.Ct. 671, 677, 8 L.Ed.2d 547 (1963); *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953); Note, *"Smoke on the Water": Coast Guard Authority to Seize Foreign Vessels Beyond the Contiguous Zone,* 13 N.Y.U.J. Int'l L. & Pol. 249, 284–85, 295 (1980) [hereinafter cited as N.Y.U. Note]. Moreover, the legislative history of § 89(a) does not suggest that Congress intended to violate this principle. Section 89(a) was enacted in response to a Supreme Court opinion holding that the Coast Guard could seize American ships on the high seas to enforce revenue laws, but implying that it could *not* do so to enforce other laws. *See Maul v. United States,* 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927); H.R.Rep. No. 2452, 74th Cong., 2d Sess. 2–3 (1936); S.Rep. No. 2211, 74th Cong., 2d Sess. 2 (1936). Justices Brandeis and Holmes, concurring in *Maul,* disagreed with the majority opinion's implication, for they believed the Coast Guard should be able to seize American ships on the high seas to enforce any American law. They assumed, however, that Congress would conform with general principles of international law—principles which did not "confer the general authority to seize foreign vessels upon the high seas." *Maul v. United States,* 274 U.S. at 523 & n. 26, 47 S.Ct. at 741 & n. 26 (Brandeis & Holmes, JJ., concurring). Congress took note of the opinion of Justices Brandeis and Holmes, and sought to enact the Brandeis/Holmes concurrence. *See* H.R.Rep. No. 2452, 74th Cong., 2d Sess. 1–3 (1936); S.Rep. No. 2211, 74th Cong., 2d Sess. 1–2 (1936). Congress wished to authorize the search of vessels on the high seas to the extent such searches conformed to international law, but there is no indication that it wished to go further.

(b) We next consider whether the search violated international law—a difficult question. Despite the implications of Fifth Circuit dicta to the contrary, *see United States v. Williams,* 617 F.2d 1063, 1076 (5th Cir.1980) (*en banc*) (§ 89(a) allows high seas searches of foreign vessels without flag state permission, provided reasonable suspicion exists); Harv. Note, *supra,* at 727 n. 11, international law does not allow one nation to search on the high seas vessels belonging to another except in very special circumstances. As a fundamental rule, the proposition "that a merchant ship flying the flag of a recognized State is immune from all interference on the high seas by the ships of any other than her own State" is widely accepted. C. Colombos, *The International Law of the Sea* 311 (6th Ed. 1967); *see The Sagatind,* 4 F.2d 928, 931 (S.D.N.Y. 1925) (A. Hand, J.); H. Smith, *The Law and Custom of the Sea* 64–65 (3d ed. 1959); Harv. Note, *supra,* at 727 n. 11. As stated in the Convention on the High Seas:

> Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas.

Convention on the High Seas art. 6(1), *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, 450 U.N.T.S. 11 (entered into force Sept. 30, 1962). This statement embodies the principle of "freedom of the seas," the principle for which we fought the War of 1812.

The Convention on the High Seas apparently allows only narrow exceptions to this rule of freedom of navigation, for the Convention itself states that the exceptions will be "provided for in international treaties or in these articles." Commentators agree: "even suspicious conduct will not justify active interference [with a foreign merchant vessel on the high seas in peacetime] except in those cases, such as slave trading, where it is authorized by treaty." H.

Smith, *supra,* at 64–65; *accord, e.g.,* C. Colombos, *supra,* at 310–15; N.Y.U. Note, *supra,* at 276 & n. 107; Note, *Free Navigation: Examination of Recent Actions of the United States Coast Guard,* 13 Vand. J. Transnat'l L. 141, 144–45 (1980) [hereinafter cited as Vand. Note].

Thus, the Convention states that we should look to a treaty—in this case the Convention on the High Seas itself—to determine whether a search violates international law. The Convention, as interpreted in light of recognized principles of international law, provides several exceptions. It allows the ship of one state to search another's ship on the high seas when those on the searching ship suspect the foreign ship of piracy, suspect the ship of engaging in the slave trade, suspect that the ship despite the foreign flag is a domestic ship, are engaged in hot pursuit, or have obtained the permission of the flag state. *See* Convention on the High Seas, *supra,* arts. 14–23; H. Smith, *supra,* at 65–70; Vand. Note, *supra,* at 144–47. The Convention may also allow searches in cases where those on the searching ship believe that the foreign ship threatens the security of their own nation. *See* Vand. Note, *supra,* at 146 n. 19; *cf.* H. Smith, *supra,* at 70–71. Arguably, three of these exceptions apply here.

First, the Coast Guard may have had reason to believe that the PATRICIA was either a domestic ship or a stateless ship over which any nation may assert jurisdiction. *See* Smith, *supra,* at 64–65; Vand. Note, *supra,* at 156. The PATRICIA, after all, sailed for a considerable time with no flag despite numerous attempts to communicate with it, and it hauled up its Honduran flag only at the eleventh hour.

Second, the Coast Guard arguably searched the ship with Honduras' consent. Given the need for speedy action, the hostility shown by all nations including Honduras to the international drug trade, *see Restatement (Revised) of Foreign Relations* § 522(2)(a) & comment c (Tent. Draft No. 3, 1982) ("general condemnation" of drug traffic); *Restatement (Second) of Foreign Relations* § 34 note 2 (1965) ("universal

condemnation" of drug traffic), and the fact that Honduras apparently did not protest the seizure, Honduras may arguably be said to have ratified the search. *Cf. United States v. Dominguez,* 604 F.2d 304, 308 (4th Cir.1979) (where Bahamas government's confirmation of its permission to seize ship referred to wrong registration number but where Bahamas government did not protest seizure of ship, defendant cannot contest validity of permission), *cert. denied sub nom. Sarmiento v. United States,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980).

Although Coast Guard regulations specifically require its units to obtain the permission of the Coast Guard Commandant before searching foreign vessels on the high seas, *see* Commandant Instruction No. 16244.1 (1978), and although the Commandant generally grants permission only after the foreign state has consented to the search, a violation of this regulation does not automatically constitute a violation of international law.

Third, some authorities suggest that coastal nations have a right to search hovering vessels up to a "reasonable" distance from shore where serious crime is at issue, even if that search extends beyond the state's territorial waters or contiguous zone. *See* Brown, *Protective Jurisdiction,* 34 Am. J. Int'l L. 112, 114 (1940) ("Questions concerning the extent of the zone of protective jurisdiction . . . can only be answered by the rule of reason in each individual case."); *Comment to Draft of Convention on the Law of Territorial Waters,* art. 20, 23 Am. J. Int'l L.Spec.Supp. 334, 335 (1929) (zone where search is allowed "is determined not by mileage but by the necessity of the littoral state and by the connection between the interests of its territory and the acts performed on the high seas"); *see also Church v. Hubbart,* 6 U.S. (2 Cranch) 187, 234–35, 2 L.Ed. 249 (1804); *The Panama,* 6 F.2d 326, 327 (S.D.Tex.1925); *The Rosalie M.,* 4 F.2d 815, 816 (S.D.Tex.1925), *aff'd on other grounds,* 12 F.2d 970 (5th Cir.1926); *The Grace and Ruby,* 283 F. 475, 478 (D.Mass. 1922); Dickenson, *Jurisdiction at the Maritime Frontier,* 40 Harv.L.Rev. 1, 21–22

(1926). Such a flexible interpretation of a nation's "protective jurisdiction," *see* Brown, *supra,* conceivably fits within the exception to the free navigation principle related to "national security"—a provision arguably implicit in the High Seas Convention. *Cf.* H. Smith, *supra,* at 70–71; Vand. Note, *supra,* at 145–46 & n. 19. Although we recognize that a provision for Coast Guard searches up to sixty-two miles from shore proved highly controversial during prohibition, *see* Ficken, *The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law,* 29 U. Miami L.Rev. 700, 709–11 & nn. 35–36 (1975), because the antipathy to international drug traffic is more widespread than was the antipathy to the liquor trade, *see id.* at 720–21, and because the use of hovering "mother ships" has become so common, the reasonableness of searches beyond the contiguous zone may now be more widely accepted. *See Restatement (Revised) of Foreign Relations* § 522(2)(a) & comment c (Tent. Draft No. 3, 1982) (search but not seizure of narcotics smuggling ship permitted).

The application of the first two of these possible exceptions to this case, however, would involve factually based determinations not made by the district court, and to apply the third would require a difficult exploration of the murky waters of international law. Rather than remand the case or conduct that exploration, we shall assume for the sake of argument that the exceptions do not apply, and that the search therefore exceeded the bounds of § 89(a). We shall also assume that the Coast Guard failed to comply with its regulation requiring Honduras' advance permission. For, as discussed below, even under these assumptions we believe the evidence was properly admitted.

■ (c) We turn then to the final question: assuming that the search violated international law and therefore was not authorized by § 89(a), and assuming that it also violated the Coast Guard's "advance permission" regulation, does the "exclusionary rule" require suppression of its fruits? We think not. The Supreme Court has held that lack of statutory authority and the contravention of a regulation do not automatically invoke the exclusionary rule. *See United States v. Caceres,* 440 U.S. 741, 755, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979) ("we decline to adopt any rigid rule requiring federal courts to exclude any evidence obtained as a result of a violation of these rules"); *United States v. Giordano,* 416 U.S. 505, 524–29, 94 S.Ct. 1820, 1831–33, 40 L.Ed.2d 341 (1974); *see also* 1 W. LaFave, *Search and Seizure* § 1.3(b) (1978). The exclusionary rule was not fashioned to vindicate a broad, general right to be free of agency action not "authorized" by law, but rather to protect certain specific, constitutionally protected rights of individuals. Were this not so, courts might have to suppress, for example, information that an agency such as the FCC (or Department of Labor) gathers in a Community Antenna Television regulatory proceeding (or a Fair Labor Standards Act proceeding) that later turns out to have been beyond the agency's statutory authority. *Cf. United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968) (FCC's authority over CATV "is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting"); *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944) (construing scope of administrative authority under FLSA). Yet, the fact that an agency's employees may exceed the scope of a statute's or a regulation's authority does not automatically make their actions "unreasonable" either in Fourth Amendment terms or as a matter of ordinary understanding of reasonableness. Thus, it is not surprising that the Supreme Court in *Caceres* denied any such principle of automatic exclusion.

On the other hand, courts have found strong reason to apply the exclusionary rule if an agency gathered information "in direct violation of the constitutional rights of the defendant...." *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 346,

58 L.Ed. 652 (1914). But, in this case the search violated none of Hensel's constitutionally protected interests. For reasons previously stated, *see* p. 25 *supra,* the search did not invade Hensel's Fourth Amendment privacy interests, for the search was supported by "probable cause." Hensel is wrong in suggesting *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), holds to the contrary, for *Ramsey* supports the notion that a court must analyze the statute or regulation involved in terms of the interests protected by that statute or regulation before deciding whether to invoke the exclusionary rule. In this case, the statute and regulation arguably violated (insofar as they incorporate principles of international law) were designed not to protect the privacy rights of ship captains, but rather to protect the rights of foreign sovereigns. In such a situation, we find the Fifth Circuit's conclusion in *United States v. Cadena,* 585 F.2d 1252, 1261 (5th Cir.1978), directly on point: "[T]here is no basis for concluding that violation of these international principles must or should be remedied by application of the exclusionary rule or by dismissal of the indictment unless Fourth Amendment interests are violated." Accordingly, we reject the argument that the Coast Guard's violation of the statute and regulation in this case requires us to apply the exclusionary rule.

A related way to reach the same conclusion is to say that Hensel lacks "standing." That is, Hensel is not entitled to invoke the exclusionary rule on his own behalf, for any violation of international law invaded not his rights but rather the rights of Honduras. The rule of international law in the case at bar is a rule designed to secure peace among nations, not to protect the privacy of individuals. As one commentator wrote, the principle of freedom of the seas "does not protect the smuggler, but it forbids the claim, generally, to jurisdiction on the high seas . . . ." W. Masterson, *Jurisdiction in Marginal Seas with Special Reference to Smuggling* 383–84 (1929); *see* McDougal & Burke, *Crisis in the Law of the Sea: Community Perspectives versus Na-*

*tional Egoism,* 67 Yale L.J. 539, 539 (1958) ("The historic function of the international law of the sea has long been recognized as that of achieving an appropriate balance between the special exclusive demands of coastal states, and other special claimants, and the general inclusive demands of all other states in the world arena."). Even if international law gives Hensel as captain a right to sue for damages suffered during an illegal search, *see The Marianna Flora,* 24 U.S. (11 Wheat.) 1, 42, 6 L.Ed. 405 (1826); The Convention on the High Seas, *supra,* art. 22(3); *Restatement (Revised) of Foreign Relations* § 522(4) (Tent.Draft No. 3, 1982) (damages awardable if suspicions of narcotics traffic prove unfounded), this compensation right derives from the sovereign's right to obtain redress for damages suffered, for "rights under international common law must belong to sovereign nations, not to individuals . . . ." *United States v. Williams,* 617 F.2d at 1090. In brief, international law protects Honduras, not Hensel. And Honduras, as far as this record reveals, does not care.

The Supreme Court has made clear that a defendant cannot invoke even the *privacy* interests of a third party in order to complain of an unlawful search, *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Thus, Hensel cannot invoke the interests of Honduras, especially since Honduras' interests are not *privacy* interests, are waivable, and have not been asserted by Honduras. *See also Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

In sum, whether or not Canadian law authorized the seizure, whether or not there was sufficient evidence of a "joint venture" to invoke constitutional protections, and whether or not the seizure was unlawful under international law, the evidence against Hensel was properly admitted.

### III

#### Hensel's Hearsay Argument

We turn next to a minor matter, and Hensel's only additional argument for re-

versal. Hensel claims that the trial court erred in admitting into evidence a glass found at the Turkey Cove property. The glass had on it the word "Dink," Hensel's nickname, and tended to tie Hensel to those at Turkey Cove. As admitted to show this relation, Hensel states, the glass was hearsay.

We are tempted to say any error was "harmless" as to Hensel, *see, e.g., United States v. Honneus,* 508 F.2d 566, 572–73 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), but we need not do so, for the glass was properly admitted. The fact that the word "Dink" appears on the glass does not itself make the glass hearsay evidence, for no assertion intended by the act of putting the word on the glass was relevant to the chain of inferences the government wished the jury to draw. The jury was not asked to infer anything about the person who put the name on the glass, who for all we know or care works in a factory that turns out "name" glasses by the score. Rather, the jury was asked to infer that Dink Hensel was likely ·to have possessed a glass with the name "Dink" on it and that he, or someone he knew, placed it in the house at Turkey Cove. The first of these inferences is merely circumstantial. There is no obvious way it depends upon the statement or state of mind of any out-of-court declarant.

The second of these inferences could involve hearsay only if one accepts a highly complex line of argument: Hensel might claim that he would like to cross-examine the "unknown" person who brought the glass to Turkey Cove on the ground that this out-of-court person's state of mind is relevant to the validity of the second inference. In order to invoke the hearsay rule, Hensel would have to argue that this individual's "nonverbal conduct" in placing the glass in the house was "intended by him as an assertion," Fed.R.Evid. 801(a)(2), that "Hensel was here." Even were one to make the heroic assumption that this was Hensel's argument, it fails. It fails because Hensel did not preliminarily show the district judge that placing the glass in the house was intended as an "assertion" (*e.g.,*

that it was designed to "frame" Hensel). Yet, the Federal Rules of Evidence "place the burden [of proving such an assertive intent] upon the party claiming that the intention existed." Fed.R.Evid. 801 Advisory Committee note (a). Hence, the glass was not shown to be hearsay and it was properly âdmitted.

IV

*The Other Defendants' "Search and Seizure" Issue*

Defendants Case, Duke, Hubbard, and Standley challenge the admission of all evidence the government obtained as a result of Agent Cunniff's observation of the license number of the jeep on Lot No. 3 on June 3. This license number was a key piece of evidence. It showed that the jeep belonged to Wells whose telephone number Hensel had given to the O'HARA prior to the Coast Guard chase. Thus, the license number helped link the ship to the defendants on shore, and much subsequently obtained evidence is arguably a "fruit" of its observation.

For purposes of this appeal we accept the district court's findings, for they are adequately supported in the record. Agents Cunniff and Sinclair walked along to the public beach and waded through waist-high water to observe the dock on Lot No. 3 where they thought a ship carrying drugs was about to dock. The agents apparently believed that the only way back to civilization without braving the deep water lay through Lot No. 3. Accordingly, they crossed the lot to return to the public access road, and along their way saw the jeep in the driveway and noted the license number. Under these circumstances, the agents may have had a legal right to pass through Lot No. 3. *See, e.g., Ploof v. Putnam,* 81 Vt. 471, 71 A. 188 (1908). Even if we assume they were trespassers, however, we believe they did not violate any of the defendants' Fourth Amendment rights.

To show that their constitutional rights were violated, defendants must show

that they had "a legitimate expectation of privacy" in the license number of the jeep parked in the driveway. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. at 149, 99 S.Ct. at 433. The district court found no such legitimate expectation, given that a license plate is an item normally revealed to the public and that this license plate was observed in a place where the owner could not reasonably have expected it to remain hidden. *United States v. Hensel,* 509 F.Supp. at 1386.

The fact that the plate itself is designed for public exposure, while relevant, *see United States v. Humphries,* 636 F.2d 1172, 1179 n. 12 (9th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, ·68 L.Ed.2d 846 (1981), is not determinative. It would not, for example, justify the search of a bedroom if the plate were hidden in the mattress. Thus, we have examined the record, including the aerial photographs, with some care to determine the nature of the place where the jeep was parked.

The testimonial descriptions and the photographs suggest that the driveway to Lot No. 3 is not quite so nestled in the "middle of nowhere" as defendants would have us believe. Rather, they indicate that houses and farms are scattered every few hundred yards along the highway, and that other residents have built cabins along the coast. The public highway runs within one-quarter to one-half mile of the buildings on Lot No. 3 and three-quarters of the distance from the building to the highway is spanned by a semi-public road—a subdivision road that was open to people other than the owners or users of Lot No. 3. The record contains testimony that members of the public generally considered the beach open to their use for clamming and "gunning," and that they used the wooded area for hauling wood and fishing. On the other hand, there were "no trespassing" signs and there was a chain across the drive (although the government produced testimony that the chain and all but one sign first appeared after June 3). In any event, taken together, the

evidence could lead the district court reasonably to conclude that the defendants should have expected that a license plate on a jeep parked on their driveway—apparently only one or two hundred yards from a subdivision road, and squarely between that road and a beach used at least sometimes by clammers, hunters and others—would not remain hidden from the occasional passerby.

We have also reviewed the case law on the subject. This case seems a less compelling one for defendants than many other cases in which similar searches were upheld. *See United States v. Lace,* 669 F.2d 46 (2d Cir.1982) (surveillance of 70-acre Vermont farm by agents who entered the farm in military camouflage uniforms and maintained round-the-clock surveillance with such equipment as nightscopes, 130-power Questarlens, and infra-red goggles); *United States v. Ramapuram,* 632 F.2d 1149 (4th Cir.1980) (search of trunk of junk car abandoned on farm owned by defendant's father, where agents were able to reach car only by driving 200 yards down private road and then walking by foot across open field), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *see also United States v. Edmonds,* 611 F.2d 1386 (5th Cir. 1980) (search of private dock area upheld, where public generally considered it open to public); *United States v. Humphries,* 636 F.2d 1172, 1178–79 (9th Cir.1980) (evidence obtained as a result of an agent's entrance onto private driveway to observe license number of parked car), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981).

We have been unable to find any case in which courts have accepted claims similar to that of defendants. And, the cases they have cited are distinguishable. *See United States v. Oliver,* 657 F.2d 85 (6th Cir.1981) (search unconstitutional where agents passed many "No Trespassing" signs and locked gate along private road, and were told to leave premises); *Fixel v. Wainwright,* 492 F.2d 480 (5th Cir.1974) (search unconstitutional where agents searched shaving kit hidden in backyard); *United States v. Davis,* 423 F.2d 974 (5th Cir.)

(search unconstitutional where agents made warrantless search of defendant's yard and seized pistol), *cert. denied,* 400 U.S. 836, 91 S.Ct. 72, 27 L.Ed.2d 68 (1970); *Wattenburg v. United States,* 388 F.2d 853 (9th Cir.1968) (search unconstitutional where agents searched pile of trees next to lodge and seized nine trees as evidence); *Sanders v. State,* 264 Ark. 433, 572 S.W.2d 397 (1978) (observation of garden located behind home and separated by fence from home impermissible); *Norman v. State,* 134 Ga.App. 767, 216 S.E.2d 644 (1975) (search unconstitutional where agents searched truck located behind barn behind house); *State v. Kender,* 588 P.2d 447, 60 Hawaii 301 (1978) (observation unconstitutional where officer climbed fence to observe plants hidden behind dense, tall vegetation in defendant's backyard).

Given the facts and case law, we believe the decision of the district court on this issue was correct.

### V

### *The Sufficiency of the Evidence*

■ Each defendant, with the exception of Hensel and Duke, argues that the evidence against him was insufficient for conviction. On appeal, our task is to "consider the evidence as a whole, taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981); *see United States v. Doran,* 483 F.2d 369, 372 (1st Cir.1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974); *Parker v. United States,* 378 F.2d 641, 644 (1st Cir.), *cert. denied,* 389 U.S. 842, 88 S.Ct. 81, 19 L.Ed.2d 107 (1967). To convict the defendants of conspiring to import marijuana into the United States, the government bore the burden of proving that each defendant knowingly and intentionally joined that conspiracy. *See Direct Sales Co. v. United States,* 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943); *United States v. Izzi,* 613 F.2d 1205, 1210 (1st Cir.), *cert.*

*denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980); *United States v. Mora,* 598 F.2d 682, 683 (1st Cir.1979) ("the gist of conspiracy is an 'agreement to disobey or to disregard the law'"). But, "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development or collection of circumstances.'" *United States v. Stubbert,* 655 F.2d 453, 456 (1st Cir.1981), *quoting Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We apply these standards first to the strongest defense claims—those of Standley, Hubbard and Case. We then turn to defendants Wells and Dill.

### A

### *Standley, Hubbard and Case*

1. Standley, Hubbard and Case are three carpenters who moved to Maine and worked on the Turkey Cove property. We suspect the sufficiency of the evidence against them turns on the proper use of two key pieces of evidence: a "preparation" and "clean up" list (Government Exhibit 110), and a payroll list (Government Exhibit 111), both of which government agents found in the bedroom where defendant Duke was working at the time of his arrest. Government Exhibit 110 consists of a yellow pad which includes: 1) a page entitled "Clean Up Crew 20 Minutes" that contains suggestions of things to be done to move the "bales" from the boat to the boathouse and van, and lists fourteen names including "Bobby" and "Flip" (*see* Appendix I); 2) nineteen pages headed "Master List," with numbers one through 950 in columns and a heading "Total per col.—wt" at the bottom of each column; 3) a page headed "Wet Ones List;" 4) a page listing "Total Gross Weight" and "Total Net" by truck; and 5) a page headed "Preparation Group 9:00 Dark" which lists six names including "Charlie," and "Bobby" (*see* Appendix II). Since independent evidence indicated that defendant Case was known as "Flip," and since the jury could reasonably infer that Charles Standley was known as "Charlie"

and Robert Hubbard as "Bobby," these lists linked these men to the conspiracy. Government Exhibit 111 includes five separate pages marked A through E. One page, entitled "Pay Schedule," lists 24 names, including "Flip." Government Exhibit 111 does not refer to "Charlie" or "Bobby."

When the government initially offered the preparation, clean up, and payroll lists into evidence, the defendants objected to them as hearsay. The government invoked the "co-conspirator" exception, *see* Fed.R. Evid. 801(d)(2)(E), but also stated that it offered the lists not for the truth of the matter they asserted, but rather to allow the jury to infer that those named on the list were associated with the conspiracy from the *fact* that these lists were found in the bedroom when government agents entered the house. When arrested, Duke was writing on the payroll list (Government Exhibit 111) and the other list (Government Exhibit 110) was nearby. Cash ($2,000) was lying on Duke's desk, and a briefcase with $44,000 was on the bed nearby. The government believed the jury could circumstantially infer an association from these facts. The trial court, faced with the defendants' hearsay objection to the lists, told the jury when the exhibits were entered: "These papers are not admitted to show the truth of the statements made in them. You, as the jury, may not consider them as providing any evidence that the contents of these papers are accurate or true."

Later during the trial, the court made the preliminary findings of a likely conspiracy required by *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977) and *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), and it concluded that the statements were admissible hearsay under the co-conspirator exception to the hearsay rule. *See* Fed.R.Evid. 801(d)(2)(E). When the court decided to remove the limiting instruction, however, the defendants claimed that they were prejudiced by this ruling on the grounds that they had relied upon the government's statement that it would not use the lists to prove the truth of the assertions they contained. Accordingly, the court rescinded this ruling. On the following day, the court heard argument on the purposes for which the government could use the lists. The government argued:

We are not asserting that it in fact takes 20 minutes for the clean up crew to operate. We are not asserting that in fact "Flip" has the key. However, we are asserting that the fact that Mr. Duke was writing on one of the exhibits and the other was in close proximity with him at the time is an act of a co-conspirator from which the jury may draw certain inferences about the purpose of the act and the scheme included in it.

The court granted the government's motion to allow the use of the lists for the following purposes:

[t]he exhibits do not constitute statements admitted for the truth of any assertion contained in them but that if the Jury finds that the Defendant Duke was writing on these exhibits at the time Special Agent Cunniff encountered Duke and that Defendant Duke was in custody and control of the exhibits at that time, the Jury may consider these two exhibits as circumstantial evidence from which you may draw inferences about the relationship among the various parties and items for plan, purpose, preparation and knowledge.

The judge himself gave no instructions to the jury concerning the use of the lists. However, during closing argument the government told the jury:

You will recall that the Judge instructed you that these documents have not been admitted for the truth of the statements that are contained thereon .... You know, however, that at the time Mr. Cunniff went to the upstairs bedroom and encountered Mr. Duke that Mr. Duke was writing on Government Exhibit 111, the white paper, and also that he had $44,000 with him in a brief case and in cash. From those facts, Ladies and Gentlemen, you may consider Government Exhibits 110 and 111 as circumstantial evidence

from which you may draw certain inferences about the relationship among the parties listed in those lists and inferences about the plan, purpose, preparation and knowledge of the people involved in this conspiracy.

Defense counsel moved for a mistrial on the basis of this argument, but the court denied the motion.

We believe the court's ruling was proper. The jury was not permitted to infer Standley, Hubbard, and Case's participation from the out-of-court written assertion by the maker of the list that the three were participants in the conspiracy. The jury was permitted to infer their participation from the fact that one actively involved in the conspiracy, namely Duke, possessed a participant's list on which their names were found. We recognize that inferring participation from the juxtaposition of the fact that Duke possessed lists containing their names with the fact that Duke himself was actively involved in the conspiracy may involve a use of the lists for a purpose closely related to hearsay. *See generally* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* 801–53 to 801–57 (1979). After all, the validity of making the inference 'that a defendant participated' from the fact 'that Duke possessed a list with defendant's name' depends in part upon Duke's state of mind in possessing the list. The inference is based, first, on the assumption that Duke *believed* the three were participants, and second, on the assumption that Duke's beliefs regarding the membership of the conspiracy were, in the context of the totality of the evidence, likely to be correct.

■ Nevertheless, even if the jury's inference involved a hearsay-type of problem, the evidence was outside the scope of hearsay as defined by the Federal Rules of Evidence. *See* Fed.R.Evid. 801–806. The court allowed the jury to infer plan, purpose, preparation, knowledge, and association from Duke's possession of the list. Possession is conduct, and conduct is hearsay under the Federal Rules only if "intended . . . as an assertion." Fed.R.Evid. 801(a)(2). We do not see how Duke's possession of the list could have been "intended . . . as an assertion" of the defendants' role unless Duke had been staging an elaborate charade to implicate the defendants. If defendants believed that to be the case, however, they bore the burden of proving that the conduct was indeed intended as an assertion, *see* Fed.R.Evid. 801 Advisory Committee note (a); 4 J. Weinstein & M. Berger, *supra,* at 801–62 to 801–63, and they offered no such proof. Similar evidence has been admitted as circumstantial evidence in other cases. *See e.g., United States v. Marino,* 658 F.2d 1120, 1124 (6th Cir.1981); *United States v. Mazyak,* 650 F.2d 788, 792 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Day,* 591 F.2d 861, 883 (D.C.Cir.1978); *United States v. Ruiz,* 477 F.2d 918, 919 (2d Cir.) (*per curiam* ), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); *United States v. Canieso,* 470 F.2d 1224, 1232–33 (2d Cir.1972). And, in any event, this use would *both* fit within the "co-conspirator" hearsay exception, Fed.R.Evid. 801(d)(2)(E) (as the district court properly found to apply), *and* would have come as no surprise to defendants.

Thus, we believe the jury could properly have used the lists as evidence that Duke believed Standley, Hubbard and Case were in the conspiracy and, hence, given Duke's central role, as evidence that they were, in fact, conspirators.

■ 2. In addition to their first names being on the lists found in Duke's possession, there was other evidence from which the jury could infer that Standley, Hubbard, and Case knowingly and intentionally participated in the conspiracy. The jury could have believed that Hubbard, Case, and Standley were Georgia residents. It could conclude that the three were carpenters who had come to work on the Turkey Cove property in Maine during the time that the conspiracy was in operation. It could have inferred that they built shutters that fit on the *inside* of the boathouse windows to hide the marijuana that would be stored there. And it could have inferred that they saw the conveyor belt, the elabo-

rate radio and communications equipment, the industrial vacuum cleaner, the vans, and the navigational charts—all of which were present on the Turkey Cove property.

We believe that a jury could reasonably find that Standley was a member of the conspiracy from the evidence regarding Standley's occupation, the likelihood that the carpentry work was in fact to be used to further a drug-smuggling conspiracy, the evidence that Standley was not from Maine, the fact that items like sophisticated radios, conveyor belts and industrial vacuum cleaners were likely to be seen by one working at Turkey Cove, and Duke's possession of a "preparation" and "clean up" list mentioning Standley. This case is unlike the cases reversing convictions where the evidence consisted of little more than mere presence at the scene of the crime. *See, e.g., United States v. Mora,* 598 F.2d 682 (1st Cir.1979) (conviction reversed where defendant had traveled with woman carrying cocaine, but where there was no evidence that defendant knew woman carried drugs or that he had known her before trip); *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978) (conviction reversed where only evidence against defendant was proof of her presence on ship containing drugs and evidence of a close relationship with captain during voyage, and where there was no evidence that defendant had embarked on voyage for any purpose other than pleasure and no indication of prior association with captain); *United States v. Francomano,* 554 F.2d 483 (1st Cir.1977) (conviction reversed where defendants worked on ship carrying drugs, but where there was no evidence that they knew drugs were aboard and where there was evidence that they had sought passage on other ships and were sailing for sake of adventure). The presence of other incriminating evidence in this case makes it considerably more like *United States v. Irizarry,* 673 F.2d 554 (1st Cir.1982) (conviction for aiding and abetting affirmed where defendant was present in hotel room with others, where agents saw one of the party take a gun out of a handbag, and where agents later found that gun and two others as well as marijuana hidden in ceiling and found marijuana in ashtray and bathtub).

If the evidence is sufficient to convict Standley, it is also sufficient to convict Hubbard, since virtually all the evidence against Standley was available against Hubbard. In addition, Hubbard was arrested while leaving the Turkey Cove property in Wells' tan jeep with Case and was described as having slouched down in his seat when the police agent approached. In the jeep, the police found elaborate radio equipment, books explaining how to monitor police radio frequencies, a navigational chart showing the course of a ship (which the jury could reasonably have believed was the PATRICIA) from Florida to the Gulf of Maine; navigational equipment; Duke's passport together with a luggage tag with Duke's name and address; photographs and an airline ticket for Standley; and a car rental contract and Howard Johnsons' receipt in Wells' name. When arrested, Hubbard had various slips of paper in his pocket with the first names or nicknames and telephone numbers of various co-defendants, as well as a slip of paper mentioning radios and rollers—items which the jury could reasonably conclude were used to guide and unload the PATRICIA. As noted at p. 23, *supra,* defendant Dill bought the SUNSHINE and the boat's radio equipment in Hubbard's name.

Similarly, the evidence against Standley and Hubbard was available against Case, whose nickname "Flip" appeared on both Government Exhibit 110 and Government Exhibit 111. Case was the driver of the tan jeep in which he and Hubbard were arrested, and in which the various paraphernalia described above were found. In addition, Case had on his person at the time of his arrest the keys to a large-capacity cargo van registered in Georgia which was found, loaded with radio equipment, at the Ramada Inn in Lewiston, Maine. We therefore find the evidence sufficient to allow the conviction of Standley, Hubbard, and Case.

B

*Wells*

Wells, too, challenges the sufficiency of the evidence linking him to the conspiracy.

However, the jeep in which Case and Hubbard were arrested belonged to Wells. Wells and Hensel. were long-time acquaintances, and one of the phone numbers that Hensel aboard the PATRICIA asked the mate of a nearby fishing boat to call was that of Wells. Wells did not live in the Turkey Cove area, but was seen with Duke on the SUNSHINE on May 20, 1980, in Panobscot Bay. On May 28, a John Wells and another person registered at a hotel in Portland, Maine, and calls were made from one of their rooms to the Turkey Cove property. Wells also rented a car, the contract for which was found in the tan jeep. And Duke had on him at the time of his arrest a book with Wells' name and phone number. This evidence is adequate to allow the jury reasonably to conclude that Wells knowingly and intentionally joined the conspiracy.

### C

#### Dill

Finally, Dill claims that the evidence against him was insufficient. There was, however, considerable evidence linking him to the conspiracy. Dill lived in Georgia until early 1980, when he came to Maine and lived in one hotel after another. He bought a pick-up truck with over $3,000 in cash—from which the jury could reasonably conclude that he hoped to avoid leaving any trace of his transactions. Dill bought the SUNSHINE in Hubbard's name, and then outfitted the boat with radar and radio equipment, again in Hubbard's name. He paid for the boat and this material with cash and several separate checks. He told inconsistent stories about what he planned to do with the boat. He had the boat repaired—for which he again paid in cash—and was observed using the boat. The boat was moored at the Turkey Cove dock, and DEA agents testified that small boats like the SUNSHINE are often used by drug smugglers to guide to shore larger vessels that carry the contraband. In addition, on

March 20, 1980, Dill talked to a realtor about buying the Turkey Cove property (he did not then buy it) and paid special attention to the dock. When Hubbard was arrested, he carried two slips of paper with Dill's name and phone number, and "Craig 300" was written in a notebook found in the back of the jeep. While some of this evidence by itself may not be highly incriminating, we have no doubt that the jury might reasonably have concluded on the basis of the totality of the evidence that Dill knowingly and intentionally joined the conspiracy.

### VI

#### Other Issues

Various of the defendants raise other arguments which do not require extensive discussion.

### A

Defendant Dill argues that the jury could not validly convict him on the basis of his having provided members of a conspiracy with a boat unless it also believed that he knowingly and intentionally agreed to join the conspiracy. Hence, he says, the trial court ought to have adopted his proposed instructions, which emphasized agreement, specific intent, and criminal knowledge. It is, however, well established that a court need not "deliver a requested instruction verbatim." *United States v. Winter,* 663 F.2d 1120, 1146 (1st Cir.1981), *app. pending.* And we are satisfied that the district judge's instructions were fair, impartial, and complete statements of the law, adequately emphasizing the need to find agreement, knowledge, and intent. The district judge stated, for example,

> But what the law says is that before a jury may find that a defendant has become a member of a conspiracy, the evidence must show beyond a reasonable doubt that the conspiracy was willfully and knowingly formed and that the defendant willfully and knowingly partici-

pated in the unlawful plan with the intent to advance or further some illegal object or purpose of the conspiracy. In other words, although willful participation in a conspiracy may be established by circumstantial evidence, there must be some evidentiary basis for inferring that the defendant knew about the conspiracy and intended to participate in it and to make it succeed.... So if a defendant with understanding of the unlawful character of a plan voluntarily and intentionally encourages, advises or assists for the purpose of furthering the undertaking or scheme, that defendant then becomes a willful and knowing participant in the scheme; in other words, a conspirator.

These instructions were adequate. *See United States v. Irwin,* 593 F.2d 138, 140–41 (1st Cir.1979); *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905, 909 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977). Other requested instructions based on *United States v. Falcone,* 109 F.2d 579 (2d Cir.), *aff'd,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), were inappropriate here.

### B

■ Dill contests the admission of "expert" testimony by Agent Cunniff about the general practices of drug smugglers. The issue is whether the risk of prejudice outweighed the probative value of Cunniff's testimony. *See* Fed.R.Evid. 403. On the one hand, smuggling tons of marijuana is a complex matter. Agent Cunniff's testimony explained the methods drug smugglers generally use; thus it was testimony that would "assist the trier of fact to understand the evidence," Fed.R.Evid. 702, and helped the jury determine which alleged facts were material to the charges made against which defendants. On the other hand, Agent Cunniff sat at the prosecutor's table, and much of his testimony concerned behavior, such as making lists and buying boats, in which innocent people commonly engage. Although we recognize the risk of preju-

dice, the question facing the lower court was one of balance. "[T]he propriety of receiving expert testimony rests within the sound discretion of the trial court." *United States v. Fosher,* 590 F.2d 381, 382 (1st Cir.1979). Similar evidence has been admitted in other cases. *See, e.g., United States v. Golden,* 532 F.2d 1244, 1247–48 (9th Cir.) (*per curiam*) (DEA agent testifies about the price of drugs), *cert. denied sub nom. Trowery v. United States,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *United States v. Sellaro,* 514 F.2d 114, 118–19 (8th Cir.1973) (FBI agent testifies about bookmaking practices), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). "Given the broad discretion allowed a trial court in determining the admissibility of expert testimony," *United States v. Fosher,* 590 F.2d at 382, as well as the permissive language of Fed.R.Evid. 403, we find no error here.

### C

■ 1. Dill argues that the lower court erred in refusing to allow discovery of documents that he believes were essential to the cross-examination of Agent Cunniff. After Agent Cunniff testified on direct examination (about the general habits of drug smugglers and his investigation of Turkey Cove), the defense sought, in the trial judge's words, "a vast number of DEA manuals, guidelines, reports and memoranda, opinions, rules or regulations issued by the United States Department of Justice, and also by the DEA, all relating to drug smuggling on the coast of Maine and the eastern seaboard of the United States." As the defense conceded, this material did not involve "any documents whatsoever which [were] involved in the investigation of this particular case." The trial judge believed that these documents were not essential to Dill's defense and that, given the timing of the request and the burden it would impose on the government, the request should be denied. Having reviewed the request and the testimony, we agree.

This general conclusion disposes of most of Dill's specific claims that one or another rule or statute required the district court to allow this discovery. Dill refers to Fed.R. Evid. 705. But, as the district court stated,

> Evidence Rule 705 provides that on cross-examination an expert witness may be required to disclose the underlying facts or data upon which his expert opinion was based. Mr. Cunniff testified that his expert opinion was based upon his prior experience in drug smuggling investigations along the coast of Maine. At no time did he indicate that that opinion was predicated upon the manuals, reports, rules and regulations production of which is here sought.

This statement is correct and dispositive.

■ Dill refers to Fed.R.Crim.P. 16, governing discovery and inspection. But the district court held that the request under that rule was untimely ("as the defendants were on notice that this testimony would be presented over two weeks ago prior to the start of the trial") and that the defendants had not shown how the documents were "material to the preparation of [their] defense." Rule 16 requests ordinarily must be made before trial. *See United States v. Jensen*, 608 F.2d 1349, 1357 (10th Cir.1979); 2 C. Wright, *Federal Practice and Procedure* § 257 (1982). And Rule 16(a)(1)(C) specifically limits discovery to documents "which are material to the preparation" of the defense. Accordingly, the district court's ruling was well within its power.

■ Although Dill also refers to Fed.R. Crim.P. 17 governing subpoenas, that rule gives the district court adequate authority to deny a subpoena where production would be unreasonable. *See United States v. Nixon*, 418 U.S. 683, 698, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974). Because the district court found the requested subpoena "far too broad," "untimely," and "harass[ing]," and since these findings were well within its discretion, *see United States v. Lieber-*

*man,* 608 F.2d 889, 904 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980); 2 C. Wright, *supra,* at § 275, this rule does not help Dill. Moreover, since we believe the district court could reasonably find that the information sought was not "material" or necessary for effective cross-examination of Agent Cunniff, we reject Dill's "witness confrontation" claim under the Sixth Amendment. *See Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297 (1973).

■ Finally, Dill argues the Jencks Act, 18 U.S.C. § 3500, and the Freedom of Information Act, 5 U.S.C. § 552, support his document request. But the defendants argued no FOIA or Jencks Act request to the court below, and they are therefore barred from pursuing those claims here. *See United States v. Campa*, 679 F.2d 1006, 1011 (1st Cir.1982); *United States v. Carter*, 613 F.2d 256, 261 (10th Cir.1979), *cert. denied*, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980) ("By failing to make a timely motion for the production of the Jencks Act materials as the statute requires, appellants waived any right they may have had to complain on appeal of an alleged lack of governmental production."). There is no special circumstance warranting an exception.

2. Dill argues that the government violated its agreement under an April 8, 1981, court order to produce all Jencks Act materials at least five days prior to the start of the trial. The claim of violation was not made to the court below, and accordingly is waived.

■ 3. Dill argues (in his reply brief) that the government violated the Jencks Act anew when it discussed testimony Agent Cunniff gave in other trials. However, a "transcript of a witness' testimony in a prior trial does not come within the language of the Jencks Act." *United States v. Baker*, 358 F.2d 18, 20 (7th Cir.),

cert. denied, 385 U.S. 869, 87 S.Ct. 135, 17 L.Ed.2d 96 (1966); cf. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 398, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323 (1959) (grand jury minutes not covered by Jencks Act). Regardless, given the fact that the testimony is part of the public record, the government's failure to disclose the material would constitute harmless error. See, e.g., United States v. Honneus, 508 F.2d at 572–73.

## D

Wells argues that his in-court identification by former Coast Guardsman Anthony Stewart, who had boarded the SUNSHINE when it was in distress on May 20, 1980, violated his Fifth and Sixth Amendment rights. During the trial, Stewart had been called to the courthouse to identify defendants Wells and Duke as the men he saw on the SUNSHINE. While waiting to meet with the U.S. Attorney, Stewart talked with three Coast Guardsmen who were also at the courthouse to identify Wells and Duke. They had already identified the two men from photographs and assured Stewart that it was "easy to pick them out." After the U.S. Attorney had talked with Stewart about the case, the U.S. Attorney told him, in Stewart's words, to "just look around to see if [he] could pick them out." When Stewart went to the courthouse snack bar later that day, he noticed and identified Wells and Duke. The district judge described the incident as follows:

> The defendant was standing with a group of others, some eight or nine, of whom two may have been women, the others men; all dressed in civilian clothes in the lunch area in the courthouse; and without prompting or suggestion of any type, identified the two individuals in question.... [There is no] evidence to support a finding by this Court that the identification occurred as a result of an arranged confrontation .... While it's true that the witness Stewart was requested by the United States Attorney to

keep his eyes open as he walked around the courthouse to see whether there was anyone whom he might identify, there is nothing in the record to support the finding by the Court that the actual confrontation which occurred was in any way prearranged by the United States Attorney's Office.

 Wells claims that these circumstances amount to a violation of the Fifth Amendment. We disagree. The Fifth Amendment right to due process protects a defendant against unduly suggestive identification procedures. Thus, the right is invoked in identification situations to prevent "the primary evil" of "a very substantial likelihood of irreparable misidentification." Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); see Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) ("reliability is the linchpin"). Stewart was not subjected to a suggestive encounter, nor was the incident orchestrated by the government. Neither the comments of the U.S. Attorney nor the comments of the Coast Guardsmen increased the likelihood that Stewart would identify Wells and Duke as the men aboard the SUNSHINE. See United States v. Massaro, 544 F.2d 547, 550–51 (1st Cir.1976) (chance encounter in courthouse hall), cert. denied, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977). Accordingly, we find no violation of Wells' Fifth Amendment rights.

 Wells also claims a violation of the Sixth Amendment. But the Sixth Amendment right to counsel at identification sessions is designed to protect defendants from suggestiveness or other prejudicial acts that might otherwise take place. See Moore v. Illinois, 434 U.S. 220, 224, 98 S.Ct. 458, 462, 54 L.Ed.2d 424 (1977). The right to counsel at an identification session, the Supreme Court explained in United States v. Wade, 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967), depends on "whether

potential substantial prejudice to defendant's rights inheres in the particular confrontation and [on] the ability of counsel to help avoid that prejudice." *See also Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Since Stewart's identification of Wells and Duke was not arranged by the government, since it was not "suggestive," and since it was accidental, "we fail to see any harm resulting from the defense counsel's absence." *United States v. Massaro,* 544 F.2d at 551 (concerning an accidental identification in the courthouse halls) (opinion by Mr. Justice Clark).

### E

■ Finally, defendants argue that the agents' use of nightscopes, spotting scopes, binoculars, telescopes, and aerial surveillance in observing activities on the Turkey Cove property violated their Fourth Amendment rights. After examining the record, we agree with the government that appellants are foreclosed from raising this issue on appeal by their failure to present it to the court below.

Toward the close of cross-examination of the government agents about their use of optical equipment, the district judge asked the defendants whether they claimed "that any Fourth Amendment rights are violated by the use of a telescope … or a nightscope to observe activity on a dock such as this." Counsel for defendant Duke responded, "No Your Honor. That's not our position." No one disagreed. Later in the suppression proceedings, the judge again asked whether the defendants contended that their Fourth Amendment rights were infringed by "observations made from the [observation post] across the St. George River." The judge stated that he believed

that no violation could have occurred unless the sight-enhancing equipment permitted the agents to see inside the structures on Lot No. 3, and the defense counsel replied that that was "a correct statement of the law." This was a reasonable position to take, given the case law on the subject. *See, e.g., United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) (Brandeis, J.) (approving use of search lights, marine glasses, and field glasses); *United States v. Lace,* 669 F.2d 46 (2d Cir.1982) (approving use of nightscopes, 130-power Questar lens, and infra-red goggles on rural property); *United States v. Allen,* 633 F.2d 1282, 1289–90 (9th Cir.1980) (approving use of helicopter surveillance of secluded sea-side ranch where airspace above property was routinely traversed by Coast Guard helicopters), *cert. denied,* 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *United States v. Minton,* 488 F.2d 37 (4th Cir.1973) (*per curiam*) (approving use of binoculars), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). Finally, during oral argument at the closing of the motion to suppress, no defense attorney argued that the officers' use of optical equipment constituted a Fourth Amendment violation. In these circumstances, we think the district court's finding that the defendants waived this claim, 509 F.Supp. at 1384 n. 9, is supported by the record. *See United States v. Campa,* 679 F.2d at 1011 (argument not made below will not be considered on appeal absent special circumstances); *Langton v. Berman,* 667 F.2d 231, 233 (1st Cir.1981); *United States v. Miller,* 636 F.2d 850, 853 (1st Cir. 1980) (*per curiam*).

*For the reasons stated above, the convictions returned against the appellants are affirmed.*

GOVERNMENT EXHIBIT # 110

**mead legal pad** The Mead Corporation Dayton Ohio 45463 59-6226

F-1
#1

MH 6/3/80 UPSTAIRS
BED BEDROOM
 MAIN HOUSE

## CLEAN UP CREW 20 minutes

I. REMOVAL of ROLLERS AND PLYWOOD & SAW HORSES from dock AND OTHER DEBREA; to be VACCUMMED check AGAIN AROUND 1ST light !! IMPORTANT
LEAVE (3) 10' sections iN BOAT house
SECURE all OTHER iN GARAGE Quietly!
bRiNG VACUMN to bOAT house — LEAVE
LOCK GARAGE: X-L GIVE KEY TO Flip

After OUTSIDE AND DOCK AREA ARE clean,
EVERYBODY INSIDE BOAT house, start stRiPPiNG
bALES, Don't strip PiLLOWS OR ANY SiNGLE BiNDiNGS
If WE RUN OUT OF SPACE iN bOAT house
LOAD White GMC

| | |
|---|---|
| XL | BOBBY |
| PETE | POCKETS |
| Richex | |
| Shawn | |
| Bill | |
| Mike | |
| J.R. | |
| NASTY | |
| GARY | |
| Rick | |
| Bill | |

EVIDENCE CE-80-0008
Exhibit No: FF
Initials:
Date:

## APPENDIX II

PREPARTION GROUP 9:00 DARK

Charlie
Bill

Bobby
Gary
Pockets
Rick

EVIDENCE CE-80-0008

Exhibit No. FF
Initials: WD
Date. 6-6-30